UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

LIBERTY MUTUAL FIRE INSURANCE COMPANY, LIBERTY INSURANCE CORPORATION, AMERICAN STATES INSURANCE COMPANY, LM GENERAL INSURANCE COMPANY, LM INSURANCE CORPORATION, THE FIRST LIBERTY INSURANCE CORPORATION,

                                                      Plaintiffs,

-against-

PAUL BABITZ, D.C., ANTHONY DESANO, D.C., ROSS FIAKOV, D.C., IVAN LAM, D.C., MARK SOFFER, D.C., GUY VILLANO, D.C., MELANIE WALCOTT, D.C., CHIROPRACTIC PERFORMANCE SERVICES, P.C., CROSSTOWN CHIROPRACTIC, P.C., DYNAMIC HEALTHCARE CENTER, LLC, JC CHIROPRACTIC, PLLC., MODERN CHIROPRACTIC SOLUTIONS, LLC, NASSAU CHIROPRACTIC SERVICES, P.C., NEW YORK CORE CHIROPRACTIC, P.C., AND SPINAL PRO CHIROPRACTIC, P.C.,

                                                      Defendants.

20-CV-3238

COMPLAINT

JURY TRIAL DEMANDED

Liberty Mutual Fire Insurance Company, Liberty Insurance Corporation, American States Insurance Company, LM General Insurance Company, LM Insurance Corporation, The First Liberty Insurance Corporation (interchangeably referred to herein as "Plaintiffs" and "Liberty Mutual"), by their attorneys Morrison Mahoney, LLP, for their Complaint against Defendants Paul Babitz, D.C., Anthony Desano, D.C., Ross Fiakov, D.C., Ivan Lam, D.C., Mark Soffer, D.C., Guy Villano, D.C., Melanie Walcott, D.C. (collectively the "Defendant Chiropractors"), Chiropractic Performance Services, P.C., Crosstown Chiropractic, P.C., Dynamic Healthcare Center, LLC, JC Chiropractic, PLLC., Modern Chiropractic Solutions, LLC, Nassau Chiropractic Services, P.C., New York Core Chiropractic, P.C. and Spinal Pro Chiropractic, P.C. (collectively the "Defendant PCs") (the Defendant PCs and Defendant Chiropractors are collectively referred to as the "Defendants"), allege as follows:

## PRELIMINARY STATEMENT

1.      On information and belief, from at least 2014 and continuing through the date of the filing of this Complaint, Defendants engaged in parallel, related, and virtually identical schemes to defraud Liberty Mutual through the exploitation of New York's Comprehensive Motor Vehicle Insurance Reparations Act (popularly known as the "No-fault Law").

2.      In pursuit of their fraudulent schemes, which Defendants fraudulently concealed from Liberty Mutual, the Defendants collectively utilized a common fraudulent blueprint as a business plan, sharing common documentation, using the same fraudulent billing codes, making the same misrepresentations, and engaging in virtually identical patterns of fraud that could not possibly be the product of happenstance, but rather, are evidence of related fraudulent billing schemes that trace back to a common genesis and framework.

3.      Pursuant to the No-fault Law, policyholders and others who suffer in automobile accidents ("Covered Persons") can obtain payments from the policyholders' automobile insurance companies, like Liberty Mutual, for necessary medical care ordered by the Covered Persons' medical providers. Covered Persons are also permitted to assign those benefits to chiropractors and other licensed healthcare providers enabling them to bill insurance companies directly for their services.

4.      This action seeks to recover more than $266,000 that Defendants stole from Liberty Mutual through the submission of hundreds of false and/or fraudulent insurance claims seeking reimbursement for what they referred to Pain Fiber Nerve Conduction Study Testing ("pf-NCS Testing") (formerly referred to as Voltage-actuated Sensory Nerve Conduction Threshold Testing ("Vs-NCT Testing")) that was not performed as billed, was medically unnecessary and/or was of no diagnostic value.

2

5. In furtherance of Defendants' fraudulent billing schemes, individuals who were purportedly involved in automobile accidents would present to one of the Defendant Chiropractors and/or Defendant PCs where the Defendants would purportedly perform, or cause to be performed, pf-NCS Testing to purportedly diagnose abnormalities in the Covered Persons' peripheral nerves. Peripheral nerves consist of bundles of fibers which are capable of detecting sensation, with the largest and fastest fibers are known as A-Alpha and A-Beta fibers, and the smaller and slower conducting fibers that transmit feelings of pain known as C-fibers and A-Delta fibers.

6. On information and belief, at all relevant times mentioned herein, the pf-NCS Testing allegedly provided by Defendants purported to diagnose abnormalities in peripheral nerves by selectively delivering an electrical current to a Covered Person's sensory nerve and measuring the electrical response of the nerve's A-Delta fiber.

7. On information and belief, at all relevant times mentioned herein, Defendants, purported to selectively deliver an electrical current to a nerve's A-Delta fiber using the Axon-II Voltage-Input Sensory Nerve Conduction Threshold Testing Device (the "Axon-II").

8. On information and belief, pf-NCS Testing is performed by administering an electrical current to sites on the body through an electrode placed on the surface of the skin. Once the electrode is held against the skin and the stimulating current is turned on, the person being tested is asked to verbally indicate when they feel the slightest sensation. If no sensation is felt at a given level of stimulation, the intensity of the electrical current applied to the skin is increased by turning a dial on the Axon-II until the subject indicates that they feel the stimulus. The stimulus level is then turned down partially and then increased again to identify the precise threshold of stimulus perception, which is the lowest level of stimulus where the subject first perceives the electrical stimulus as a "tickle."

9. When the threshold of stimulus perception is detected, Defendants purport to have selectively stimulated the A-Delta fiber within the subject's nerve.

10. On information and belief, the Axon-II was incapable of selectively stimulating A-Delta pain fibers, and instead, stimulate sensory fibers non-specifically. However, because of their inherent properties, the A-Alpha and the A-Beta fibers which transmit perception of touch and vibration are stimulated at a lower stimulus threshold than the pain fibers which require higher levels of stimulation.

11. On information is belief, at all relevant times mentioned herein, the Axon-II purported to deliver an electrical current at frequency of 250 Hz.

12. On information and belief, it is impossible to selectively stimulate the A-Delta fibers using an electrical frequency of 250 Hz, because at that level of stimulus the A-Beta and A-Delta fibers are also being activated.

13. On information and belief, notwithstanding that the Axon-II was incapable of performing the tests that Defendants claimed, Defendants submitted bills and supporting documentation to Liberty Mutual seeking reimbursement for pf-NCS Testing which was not rendered as billed, was medically unnecessary and/or of no diagnostic value.

14. On information and belief, at all relevant times mentioned herein, Defendants' purported diagnoses relating to the pf-NCS Testing of Covered Persons were entirely dependent upon Covered Persons' subjective recognition of the electrical stimulus being applied through the Axon-II.

15. On information and belief, because pf-NCS Testing is a subjective test which is entirely dependent on a Covered Persons' recognition of an electrical stimulus, it is neither reasonable nor necessary for the diagnosis of sensory or peripheral neuropathies.

16.     On information and belief, in addition to administering medically unnecessary pf-NCS Testing, which was not medically necessary and/or of no diagnostic value to Covered Persons, one or more Defendants, as a matter of practice and protocol, fraudulently billed Liberty Mutual for pf-NCS Testing using Current Procedural Terminology ("CPT") Codes 95904 and/or 95999.

17.     On information and belief, CPT Code 95904 is reserved exclusively for sensory Nerve Conduction Velocity Testing, which is an objective form of testing used to diagnose nerve abnormalities.

18.     On information and belief, CPT Code 95999 is reserved for "unlisted neurological or neuromuscular diagnostic procedures."

19.     On information and belief, at all times relevant herein, pf-NCS Testing, if reimbursable at all, was required to billed pursuant to CPT Category III Code 0110, which is a temporary code that allows for data collection on emerging technology, services and procedures.

20.     On information and belief, unlike standard Nerve Conduction Velocity Testing, pf-NCS Testing is not an objective form of testing.

21.     On information and belief, standard sensory Nerve Conduction Velocity Testing involves stimulating the sensory nerve with an electric shock.  When the nerve is stimulated by the electric shock, it depolarizes (fires) resulting in a wave of electrical activity (the Sensory Nerve Action Potential or "SNAP") which moves along the nerve in both directions. Recording electrodes applied to the skin surface a measured distance from the stimulus site over the same nerve.

22.     The stimulus is usually given at a rate of 1/second (1 Hz), with stimulus duration of 100-200 milliseconds (0.1-0.2 seconds). The SNAP is recorded at a distant site, over the nerve

being tested, and is evaluated for distal latency and/or conduction velocity (speed of conduction), as well as amplitude (height of response) and configuration (shape of response). All of the sensory nerve fibers contribute to the SNAP, but the calculated conduction velocity (or speed of conduction) is dominated by the larger, myelinated fibers.  Therefore, it is generally accepted that standard NCS are primarily measuring the function of the A-Alpha fibers.

23.     On information and belief, in order to be eligible for reimbursement under CPT Code 95904, the billed for electrodiagnostic test must measure amplitude, latency configuration and velocity.

24.     On information and belief, at all at relevant times mentioned herein, the Axon-II purportedly used by Defendants were incapable of recording the Amplitude, Latency and Velocity of a nerve's response to an external electrical stimulus.

25.     Use of a CPT code denotes that the essential services reported by that CPT code have been provided. On information and belief, at all at relevant times mentioned herein, one or more Defendants grossly misstated the services purportedly rendered by billing under CPT Codes 95904.

26.     On information and belief, at all relevant times mentioned herein, in furtherance of their schemes to exponentially increase their billing through the submission of fraudulent claims, Defendants purportedly performed pf-NCS Testing which they knew or should have known was incapable of diagnosing sensory or peripheral neuropathies.

27.     On information and belief, pf-NCS Testing was purportedly performed by the Defendants without any expectation for the test results to actually alter the patients' clinical management which represents a knowing and willful misrepresentation of the clinical utility of the testing purportedly provided.

28.     On information and belief, at all relevant times mentioned herein, Defendants purportedly performed pf-NCS Testing which was not rendered as billed, medically unnecessary and/or of no diagnostic value.

29.     On information and belief, the clinical validity of pf-NCS Testing, in general, and the use of the Axon-II for the diagnosis of peripheral neuropathies, in particular, has never been verified by credible and reliable evidence.

30.     By way of example and not limitation, on or about July 8, 2003, the Center for Medicare Studies ("CMS") issued a Decision Memorandum concluding that pf-NCS Testing in general, and pf-NCS Testing performed with the Axon-II's substantially similar predecessor, the Medi-Dx, in particular, is (i) neither reasonable nor necessary for the diagnosis of sensory or peripheral neuropathies because it is a subjective test that is not clinically effective, and (ii) incapable of providing information on the amplitude, latency configuration or velocity of a nerve response necessary for billing pursuant to CPT Code 95904.

31.     On information and belief, subsequent to the 2003 CMS Memorandum, and in an effort to ostensibly add an objective component to the pf-NCS Testing, the manufacturer of the Medi-DX added a device to be used with it, called a "Potentiometer," and rebranded the "Medi-DX" as the "Axon-II."

32.     On information and belief, the Potentiometer is a device which purports to display a digital reading of the electrical current resulting from the stimulation of the A-Delta fibers in the subject's sensory nerve in response to stimulation by the Axon-II device.

33.     On information and belief, in furtherance of the scheme to defraud alleged herein, in addition to displaying the electrical current being input from the Axon-II, the Potentiometer

7

purports to also display a small increase in its reading as a result of additional electrical current contributed by the Covered Person's nerve's A-Delta fiber being activated.

34.     On information and belief, at all relevant times mentioned herein, to the extent that Defendants purportedly used the Axon-II to perform pf-NCS Testing on Covered Persons, Defendants falsely and fraudulently misrepresented that the small increase purportedly displayed on the Potentiometer's reading was an objective reading of the amplitude of the Covered Person's A-Delta nerve fiber response.

35.     On information and belief, at all relevant times mentioned herein, the Potentiometer was incapable of measuring the amplitude of the Covered Person's A-Delta nerve fiber response.

36.     On information and belief, even if the Potentiometer were capable of measuring the amplitude of the response of the A-Delta fibers, the Axon-II is incapable of measuring the latency configuration and velocity of a nerve's response to an external electrical stimulus, which are requirements for reimbursement pursuant to CPT Code 95904.

37.     On information and belief, Defendants submitted identical boilerplate medical records, reports and bills to Liberty Mutual for reimbursement that contained nearly identical, false and fraudulent statements regarding the clinical efficacy of pf-NCS Testing for the diagnosis of sensory or peripheral neuropathies.

38.     On information and belief, the identical boilerplate medical records, reports and bills submitted by one or more Defendants to Liberty Mutual for reimbursement contained false and fraudulent statements that pf-NCS Testing is reimbursable pursuant to CPT Code 95904.

39.     On information and belief, pf-NCS Testing is not reimbursable pursuant to CPT Code 95904.

40.     By way of example and not limitation, one or more Defendants, as a matter of pattern, practice and protocol, routinely misrepresented that: (i) they performed Nerve Conduction Studies on Covered Persons which were reimbursable pursuant to CPT Code 95904, when, in fact, no such studies were performed; (ii) the Axon-II is capable of selectively detecting the activation of a nerve's A-Delta fibers, when it is not;  and (iii) the Axon-II is capable of measuring and/or recording the amplitude, latency and/or velocity of a Covered Persons' nerve responses, when it is not.

41.     On information and belief, the chiropractic practices through which the Defendant Chiropractors submitted bills for pf-NCS Testing pursuant to CPT Code 95904 include, but are not limited to: Chiropractic Performance Services, P.C., Crosstown Chiropractic, P.C., Dynamic Healthcare Center, LLC, JC Chiropractic, PLLC, Modern Chiropractic Solutions, LLC, Nassau Chiropractic Services, P.C. and Spinal Pro Chiropractic, P.C.

42.     On information and belief, the chiropractic practices through which the Defendant Chiropractors submitted bills for pf-NCS Testing pursuant to CPT Code 95999 include, but not limited to: Chiropractic Performance Services, P.C., Crosstown Chiropractic P.C., Modern Chiropractic Solutions, LLC, and New York Core Chiropractic, P.C. routinely billed Plaintiffs pursuant to CPT Code 95999.

43.     On information and belief, the Defendant Chiropractors, through their related Defendant PCs, fraudulently submitted, or caused to be submitted, bills to Liberty Mutual for pf-NCS Testing that was not performed as billed, was fabricated and/or of no diagnostic value. In that regard, in virtually every instance, the reported results associated with the foregoing tests were fictitious, meaning that Defendants routinely, intentionally and knowingly submitted fabricated reports, findings and data to Liberty Mutual to substantiate the fraudulent claims and induce

payment. By way of example and not limitation, annexed hereto as Exhibit "A" is a spreadsheet listing a representative sample of claims Liberty Mutual paid to the Defendant Chiropractors and/or the Defendant PCs for pf-NCS Testing that was not performed as billed, fabricated, and/or of no diagnostic value.

44.     On information and belief, in each instance, the Defendant Chiropractors knew or should have known that the pf-NCS Testing was bogus, contained material and misleading statements, was not rendered as billed and/or was of no diagnostic value.

45.     At all relevant times mentioned herein, the pf-NCS Testing for which Defendants sought reimbursement from Liberty Mutual was provided pursuant to a predetermined course of treatment, irrespective of medical necessity, which was not reimbursable under the No-fault Law pursuant to CPT Code 95904 or 95999.

46.     On information and belief, the Defendant Chiropractors and/or the Defendant PCs willfully engaged in the practices alleged herein with the sole object of converting money.

47.     The duration, scope and nature of the Defendants' illegal conduct bring this case well within the realm of criminal conduct to which the Racketeering Influenced and Corrupt Organization Act ("RICO") applies. The Defendants herein adopted a fraudulent blueprint regarding the purported provision of pf-NCS Testing as their business plans, and used it to participate in a systematic pattern of racketeering activity. Every facet of Defendants' operations, from generating fraudulent supporting medical documents to record keeping to billing, was carried out for the purpose of committing fraud.

48.     This lawsuit seeks to, among other things, enforce the plain language of the No-fault Law and implementing regulations, as well as its underlying public policy, which limits reimbursement of No-fault benefits to legitimate insurance claims electrodiagnostic testing.  In

doing so, Plaintiffs seek compensatory damages and declaratory relief that Plaintiffs are not required to pay any of the Defendants' No-fault claims because the Licensed Healthcare Professionals, through Defendant PCs, submitted false and fraudulent claims for pf-NCS Testing that was not performed as billed, was medically unnecessary and/or was of no diagnostic value. Such claims continue to be submitted by and/or in the name of the Defendant PCs and are, or can be, the subject of No-fault collection actions and/or arbitrations to recover benefits, and thus, constitute a continuing harm to Plaintiffs.

49.    By way of example and not limitation, annexed hereto as Exhibit "B" is a spreadsheet listing in excess of $507,000 of unpaid No-fault claims that form the basis of Plaintiffs' request for declaratory relief.  Said spreadsheet is grouped by Defendant P.C., bill/claim number, and date of service.

## **NATURE OF THE ACTION**

50.    This action is brought pursuant to:

i)      The United States Racketeer Influenced and Corrupt Organizations Act ("RICO"); 18 U.S.C. §§ 1962(c), 1964(c);

ii)     New York State Common Law; and

iii)    The Federal Declaratory Judgment Act, 28 U.S.C. § 2201.

## **NATURE OF RELIEF SOUGHT**

51.    Liberty Mutual seeks treble damages that it sustained as a result of the Defendants' schemes and artifices to defraud, and acts of mail fraud (pursuant to 18 U.S.C. § 1341), in connection with their use of the facilities of the No-fault system and its assignment of benefits mechanism to fraudulently obtain payments from Liberty Mutual for pf-NCS Testing they allegedly rendered to individuals covered by Liberty Mutual under New York State's No-fault Law.

52.     Liberty Mutual seeks compensatory and punitive damages under the Common Law.

53.     Liberty Mutual further seeks recovery of the No-fault claim payments made under the independent theory of unjust enrichment.

54.     Liberty Mutual further seeks a judgment declaring that it is under no obligation to pay any of Defendants' unpaid claims for pf-NCS Testing and any future No-fault claims for pf-NCS Testing.

55.     As a result of Defendants' actions alleged herein, Liberty Mutual was defrauded of an amount in excess of $266,000.00 the exact amount to be determined at trial, in payments which Defendants received for fraudulently billing Liberty Mutual for services that they knew or should have known were of no diagnostic value and/or fabricated and not performed as reflected in the bills submitted to Liberty Mutual.

## THE PARTIES

A.     **Plaintiffs**

56.     Plaintiff Liberty Mutual Fire Insurance Company is a corporation duly organized and existing under the laws of the State of Wisconsin, having its principal place of business in Boston, Massachusetts.

57.      Plaintiff Liberty Insurance Corporation is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Boston, Massachusetts

58.      Plaintiff American States Insurance Company is a corporation duly organized and existing under the laws of the State of Indiana, having its principal place of business in Boston, Massachusetts.

59.     Plaintiff LM General Insurance Company is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Boston, Massachusetts.

60.     Plaintiff LM Insurance Corporation is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Boston, Massachusetts.

61.     Plaintiff The First Liberty Insurance Corporation is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Boston, Massachusetts.

**B.     Defendant Chiropractors**

62.     Defendant Paul Anthony Babitz, D.C. ("Babitz") is a natural person residing in the State of New Jersey and has practiced chiropractic in the State of New York under license number 009882, issued by the New York State Education Department on or about August 24, 2000. Defendant Babitz is the listed owner of Dynamic Healthcare Center LLC and Modern Chiropractic Solutions, LLC. In furtherance of the scheme to defraud alleged herein, Defendant Babitz transacted business within New York State and/or contracted to provide services within New York State.

63.     On information and belief, in furtherance of the scheme to defraud alleged herein and as a matter of practice, procedure and protocol, Defendant Babitz purportedly performed, or caused to be performed, pf-NCS Testing at Dynamic Healthcare Center LLC and Modern Chiropractic Solutions, LLC that he knew or should have known was medically unnecessary and of no diagnostic value. Through Dynamic Healthcare Center LLC and Modern Chiropractic Solutions, LLC, Defendant Babitz fraudulently billed and received payments from Liberty Mutual

for pf-NCS Testing which was not rendered as billed, medically unnecessary and/or of no diagnostic value.

64.     Defendant Anthony Desano, D.C. ("Desano") is a natural person residing in the State of New York and has practiced chiropractic in the State of New York under license number 006997 issued by the New York State Education Department on or about May 4, 1992. Defendant Desano is the listed owner of Chiropractic Performance Services, P.C.

65.     On information and belief, in furtherance of the scheme to defraud alleged herein and as a matter of practice, procedure and protocol, Defendant Desano purportedly performed, or caused to be performed, pf-NCS Testing at Chiropractic Performance Services, P.C. that he knew or should have known was medically unnecessary and of no diagnostic value. Through Chiropractic Performance Services, P.C., Defendant Desano fraudulently billed and received payments from Liberty Mutual for pf-NCS Testing which was not rendered as billed, medically unnecessary and/or of no diagnostic value.

66.     Defendant Ross Fialkov, D.C. ("Fialkov") is a natural person residing in the State of New York and has practiced chiropractic in the State of New York under license number 012532, issued by the New York State Education Department on or about May 28, 2014. Defendant Fialkov is the listed owner of Crosstown Chiropractic, P.C.

67.     On information and belief, in furtherance of the scheme to defraud alleged herein and as a matter of practice, procedure and protocol, Defendant Fialkov purportedly performed, or caused to be performed, pf-NCS Testing at Crosstown Chiropractic, P.C. that he knew or should have known was medically unnecessary and of no diagnostic value. Through Crosstown Chiropractic, P.C., Defendant Fialkov fraudulently billed and received payments from Liberty

Mutual for pf-NCS Testing which was not rendered as billed, medically unnecessary and/or of no diagnostic value.

68.     Defendant Ivan Lam, D.C. ("Lam") is a natural person residing in the State of New York and has practiced chiropractic in the State of New York under license number 012540, issued by the New York State Education Department on or about July 16, 2014. Defendant Lam is the listed owner of New York Core Chiropractic, P.C.

69.     On information and belief, in furtherance of the scheme to defraud alleged herein and as a matter of practice, procedure and protocol, Defendant Lam purportedly performed, or caused to be performed, pf-NCS Testing at New York Core Chiropractic, P.C. that he knew or should have known was medically unnecessary and of no diagnostic value. Through New York Core Chiropractic, P.C., Defendant Lam fraudulently billed and received payments from Liberty Mutual for pf-NCS Testing which was not rendered as billed, medically unnecessary and/or of no diagnostic value.

70.     Defendant Mark Soffer, D.C. ("Soffer") is a natural person residing in the State of New York and has practiced chiropractic in the State of New York under license number 006437, issued by the New York State Education Department on or about September 27, 1990. Defendant Soffer is the listed owner of Nassau Chiropractic Services, P.C.

71.     On information and belief, in furtherance of the scheme to defraud alleged herein and as a matter of practice, procedure and protocol, Defendant Soffer purportedly performed, or caused to be performed, pf-NCS Testing at Nassau Chiropractic Services, P.C. that he knew or should have known was medically unnecessary and of no diagnostic value. Through Nassau Chiropractic Services, P.C., Defendant Soffer fraudulently billed and received payments from

Liberty Mutual for pf-NCS Testing which was not rendered as billed, medically unnecessary and/or of no diagnostic value.

72.     Defendant Guy Villano, D.C. ("Villano") is a natural person residing in the State of New York and has practiced chiropractic in the State of New York under license number 006003, issued by the New York State Education Department on or about October 6, 1989. Defendant Villano is the listed owner of Spinal Pro Chiropractic, P.C.

73.     On information and belief, in furtherance of the scheme to defraud alleged herein and as a matter of practice, procedure and protocol, Defendant Villano purportedly performed, or caused to be performed, pf-NCS Testing at Spinal Pro Chiropractic, P.C. that he knew or should have known was medically unnecessary and of no diagnostic value. Through Spinal Pro Chiropractic, P.C., Defendant Villano fraudulently billed and received payments from Liberty Mutual for pf-NCS Testing which was not rendered as billed, medically unnecessary and/or of no diagnostic value.

74.     Defendant Melanie Walcott, D.C. ("Walcott") is a natural person residing in the State of New Jersey and has practiced chiropractic in the State of New York under license number 011377, issued by the New York State Education Department on or about February 8, 2007. Defendant Walcott is the listed owner of JC Chiropractic, PLLC. In furtherance of the scheme to defraud alleged herein, Defendant Walcott transacted business within New York State and/or contracted to provide services within New York State.

75.     On information and belief, in furtherance of the scheme to defraud alleged herein and as a matter of practice, procedure and protocol, Defendant Walcott purportedly performed, or caused to be performed, pf-NCS Testing at JC Chiropractic, PLLC that he knew or should have known was medically unnecessary and of no diagnostic value. Through JC Chiropractic, PLLC,

Defendant Walcott fraudulently billed and received payments from Liberty Mutual for pf-NCS Testing which was not rendered as billed, medically unnecessary and/or of no diagnostic value.

       C.         **Defendant Professional Corporations**

76.    Chiropractic Performance Service, P.C. ("Chiropractic Performance Service") was incorporated on or about May 27, 2014, and is a professional corporation authorized to do business in the State of New York, with its principal place of business located at  84-16 Jamaica Avenue, Woodhaven, NY 11421.

77.    On information and belief, in furtherance of the scheme to defraud and as a matter of practice, procedure and protocol, Chiropractic Performance Service fraudulently billed and received payment from Liberty Mutual for Pf-NCS Testing that it knew or should have known was not rendered as billed, medically unnecessary and/or of no diagnostic value.

78.    Crosstown Chiropractic, P.C. ("Crosstown Chiropractic") was incorporated on or about June 5, 2019, and is a professional corporation authorized to do business in the State of New York, with its principal place of business located at 149 Twin Lane, N., Wantagh, NY 11793.

79.    On information and belief, in furtherance of the scheme to defraud and as a matter of practice, procedure and protocol, Crosstown Chiropractic fraudulently billed and received payment from Liberty Mutual for Pf-NCS Testing that it knew or should have known was not rendered as billed, medically unnecessary and/or of no diagnostic value.

80.    Dynamic Healthcare Center, LLC ("Dynamic Healthcare Center") was incorporated on or about February 20, 2015, and is a foreign professional limited liability company authorized to do business in the State of New York, with its principal place of business located at 2426 Eastchester Road, Suite 100, Bronx, NY 10469.

81.     On information and belief, in furtherance of the scheme to defraud and as a matter of practice, procedure and protocol, Dynamic Healthcare Center fraudulently billed and received payment from Liberty Mutual for Pf-NCS Testing that it knew or should have known was not rendered as billed, medically unnecessary and/or of no diagnostic value.

82.     JC Chiropractic, PLLC ("JC Chiropractic") was incorporated on or about May 23, 2008, and is a professional corporation service limited liability company authorized to do business in the State of New York, with its principal place of business located at 922 Broadway, Brooklyn, NY 11206.

83.     On information and belief, in furtherance of the scheme to defraud and as a matter of practice, procedure and protocol, JC Chiropractic fraudulently billed and received payment from Liberty Mutual for Pf-NCS Testing that it knew or should have known was not rendered as billed, medically unnecessary and/or of no diagnostic value.

84.     Modern Chiropractic Solutions, LLC ("Modern Chiropractic Solutions") was incorporated on or about February 3, 2015 and is a foreign professional limited liability company authorized to do business in the State of York, with its principal place of business located at 2426 Eastchester Road, Suite 100, Bronx, New York 10469.

85.     On information and belief, in furtherance of the scheme to defraud and as a matter of practice, procedure and protocol, Modern Chiropractic Solutions fraudulently billed and received payment from Liberty Mutual for Pf-NCS Testing that it knew or should have known was not rendered as billed, medically unnecessary and/or of no diagnostic value.

86.     Nassau Chiropractic Services, P.C. ("Nassau Chiropractic Services") was incorporated on or about July 5, 2013, and is a professional corporation authorized to do business

in the State of New York, with its principal place of business located at 2938 Hempstead Turnpike, Suite 215, Levittown, New York 11756.

87. On information and belief, in furtherance of the scheme to defraud and as a matter of practice, procedure and protocol, Nassau Chiropractic Services fraudulently billed and received payment from Liberty Mutual for Pf-NCS Testing that it knew or should have known was not rendered as billed, medically unnecessary and/or of no diagnostic value.

88. New York Core Chiropractic, P.C. ("New York Core Chiropractic") was incorporated on or about January 11, 2016, and is a professional corporation authorized to do business in the State of New York, with its principal place of business located at 208-10 Cross Island Parkway # 528, Bayside, New York 11360.

89. On information and belief, in furtherance of the scheme to defraud and as a matter of practice, procedure and protocol, New York Core Chiropractic fraudulently billed and received payment from Liberty Mutual for Pf-NCS Testing that it knew or should have known was not rendered as billed, medically unnecessary and/or of no diagnostic value.

90. Spinal Pro Chiropractic, P.C. ("Spinal Pro Chiropractic") was, incorporated on or about January 2, 2018, and is a professional corporation authorized to do business in the State of New York, with its principal place of business located at 375 South End Ave #24N, New York, NY 10280

91. On information and belief, in furtherance of the scheme to defraud and as a matter of practice, procedure and protocol, Spinal Pro Chiropractic fraudulently billed and received payment from Liberty Mutual for Pf-NCS Testing that it knew or should have known was not rendered as billed, medically unnecessary and/or of no diagnostic value.

## JURISDICTION AND VENUE

92. The jurisdiction of the Court arises under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, et seq.; 28 U.S.C. §§ 1331; and principles of pendent jurisdiction.

93. The Court has supplemental jurisdiction over the claims arising under state law pursuant to 28 U.S.C. § 1367(a), and the claim for declaratory relief based upon 28 U.S.C. § 2201 and § 2202.

94. Venue lies in this District Court under the provisions of 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## FACTUAL BACKGROUND

95. Liberty Mutual underwrites automobile insurance in New York State and participates as an insurer in New York State's No-fault program.

96. Under the Comprehensive Motor Vehicle Insurance Reparations Act of New York State, Ins. Law §§ 5101, et seq., Liberty Mutual is required to pay, inter alia, for health service expenses that are incurred as a result of injuries suffered by occupants of their insured motor vehicles and pedestrians ("Covered Persons") that arise from the use or operation of such motor vehicles in the State of New York.

97. On information and belief, the Defendants purportedly provided pf-NCS Testing to Covered Persons in exchange for assignments of benefits, and submitted claims for payment to Liberty Mutual for such services. In purported compliance with the No-fault Law and 11 NYCRR

65 et seq., the Defendants submitted proof of their claims to Liberty Mutual using a Health

Insurance Claim Form 1500 (known as a "HCFA 1500 form") or a substantially similar form.

98.     On information and belief, pursuant to Section 403 of the New York State Insurance

Law, the claim forms submitted to Liberty Mutual by the Defendants contained the following (or

substantially similar) warning on the back of the claim form:

> Any person who knowingly and with intent to defraud any insurance
> company or other person files an application for insurance or
> statement of claim containing any materially false information, or
> conceals for the purpose of misleading, information concerning any
> fact material thereto, may be guilty of a criminal act punishable
> under law and may be subject to civil penalties.

99.     Pursuant to the No-fault Law and implementing regulations, as well as the

applicable policies of insurance, Liberty Mutual is required to promptly process claims within 30

days of receipt of the proof of claim.

100.    To fulfill its obligation to promptly process claims, Liberty Mutual justifiably relied

upon the bills and documentation submitted by Defendants in support of their claims for pf-NCS

Testing, and paid Defendants based on the representations and information that Defendants

submitted to Liberty Mutual.

101.    On information and belief, the Defendant PCs and/or Defendant Chiropractors were

the centerpieces of parallel and related schemes to fraudulently bill Liberty Mutual for pf-NCS

Testing that was never provided as billed, medically unnecessary and/or of no diagnostic value.

102.    On information and belief, to maximize profits, the Defendant Chiropractors, either

individually or through their respective Defendant PCs, billed for pf-NCS Testing that was

medically unnecessary and/or of no diagnostic value, and based thereon, submitted to Liberty

Mutual medical reports that contained false data and material misrepresentations that were

misleading and intended to defraud Liberty Mutual.

103.    On information and belief, in furtherance of the scheme to defraud alleged herein, the Defendant Chiropractors ordered, performed and/or caused to be performed, for their economic benefit, pf-NCS Testing for Covered Persons, and submitted medical records, reports and bills to Liberty Mutual wherein they falsely represented that the billed for services yielded medically valid diagnoses when, in fact, they were of no diagnostic value.

104.    At all relevant times mentioned herein, the Defendant PCs were illegal enterprises that engaged in systematic and pervasive fraudulent practices.

105.    On information and belief, each Defendant Chiropractors through their associated Defendant PC, followed substantially similar practices that were part of a racketeering scheme that distinguished them from legitimate healthcare providers:

- Unlike legitimate medical providers, one or more of the Defendant Chiropractors routinely submitted medical reports to Liberty Mutual which misrepresented that the Axon-II detected the activation of Covered Peron's nerve's A-Delta fibers, when they did not;

- Unlike legitimate chiropractic providers, one or more of the Defendant Chiropractors routinely submitted medical reports to Liberty Mutual which misrepresented that the Potentiometer obtained and recorded the necessary information required to perform a medically useful analysis of a nerve's compound action potential, when it was incapable of doing so;

- Unlike legitimate chiropractic providers, one or more of the Defendant Chiropractors routinely submitted medical reports to Liberty Mutual which misrepresented that the Potentiometer measured the response of Covered Persons' nerve's A-Delta fibers, when it was incapable of doing so;

- Unlike legitimate chiropractic providers, one or more of the Defendant Chiropractors fraudulently claimed that the pf-NCS Testing which they purportedly performed on Covered Persons introduced a continuous stimulus at 250 Hz in order to selectively stimulate A-Delta fibers, when in fact, it is impossible to selectively stimulate the A-Delta fibers using a 250 Hz stimulus;

- Unlike legitimate chiropractic providers, the Defendant Chiropractors intentionally misrepresented, exaggerated and falsified the clinical usefulness of pf-NCS Testing for the treatment of the purported injuries suffered by Covered Persons;

- Unlike legitimate chiropractic providers, the Defendant Chiropractors routinely fabricated and submitted fraudulent documentation to Liberty Mutual for payment which contained material misrepresentations and/or reflected billing for services that were never rendered and/or not rendered as billed;

- Unlike legitimate chiropractic providers, the Defendant Chiropractors submitted bills to Liberty Mutual wherein they, with the intent to deceive Liberty Mutual and induce payment as a result thereof, falsely misrepresented the services reflected therein;

- Unlike legitimate reports prepared by chiropractic providers, virtually every pf-NCS Testing report generated by the Defendant Chiropractors yielded abnormal results with the Covered Persons having sensory defects;

- Unlike legitimate chiropractic providers, rather than perform a valid test according to prevailing standards of medical care as they must, or refer to a legitimate practitioner, the Defendant Chiropractors performed invalid and bogus pf-NCS Testing which willfully misrepresented medical facts and potentially endangered Covered Persons;

- Unlike legitimate chiropractic providers, one or more of the Defendant Chiropractors knowingly and materially misrepresented that they to measured and record the amplitude, latency and velocity of Covered Persons' nerve responses, notwithstanding that pf-NCS Testing is incapable of measuring those parameters;

- Unlike legitimate chiropractic providers, the Defendant Chiropractors knowingly and falsely represented in bills submitted to Liberty Mutual that they performed Nerve Conduction Studies on Covered Persons which were reimbursable pursuant to CPT Code 95904 and/or 95999, when in fact, no such studies were performed;

- Unlike legitimate chiropractic providers, one or more of the Defendant Chiropractors knowingly and materially misrepresented the nature of pf-NCS Testing by billing it under CPT code 95904 when that code can only be used in connection with standard Sensory Nerve Conduction Studies that meet the generally accepted criteria as defined by AMA;

23

- Unlike legitimate chiropractic providers, the Defendant Chiropractors ordered and/or performed pf-NCS Testing for Covered Persons and signed and/or authorized their signature stamp to be applied to boilerplate medical records, reports and bills for services that were materially misrepresented, never rendered, or of no diagnostic and/or treatment;

- Unlike legitimate chiropractic providers, the Defendant Chiropractors routinely submitted claims for pf-NCS Testing from which no useful medical information could be derived, and submitted false medical reports in support of those services;

106.   In these and numerous other ways, the Defendant Chiropractors sought to deceive Liberty Mutual into paying fraudulent medical claims that typically exceeded thousands of dollars per patient.

107.   To carry out their schemes, the Defendant Chiropractors generated bogus reports and bills for pf-NCS Testing that was purportedly rendered to persons involved in automobile accidents when, in fact, such services were not rendered as billed, medically unnecessary and/or of no diagnostic or treatment value.

## THE MECHANICS OF THE SCHEME TO DEFRAUD

108.   In furtherance of Defendants' fraudulent billing schemes, individuals who were purportedly involved in automobile accidents in which they ostensibly sustained soft-tissue injuries would present to one of the Defendants where the Defendants would purportedly perform pf-NCS Testing in order to ostensibly diagnose peripheral neuropathies which may have resulted from the Covered Persons' alleged accident.

109.   On information and belief, because the pf-NCS Testing purportedly performed by Defendants was of no diagnostic value, it had no medical utility in furtherance of the treatment of Covered Persons.

110.     On information and belief, the bills and documentation submitted by the Defendants in support of their claims included fraudulent reports and records which (i) intentionally misrepresented the condition and test results of Covered Persons; (ii) intentionally misrepresented, exaggerated and falsified the clinical efficacy of pf-NCS Testing for the treatment of Covered Persons; and (iii) intentionally misrepresented that the testing they purportedly performed was reimbursable pursuant to CPT Code 95904 and/or 95999, when it was not.

## THE pf-NCS TESTING SCHEME TO DEFRAUD

### A. The Human Nervous System

111.     The human nervous system provides information about the environment through senses such as vision, hearing and sensation, and allows humans to operate within that environment by causing muscle movement. The central nervous system is composed of the brain and the spinal cord, and at each segment of the spinal cord, nerves emerge to form the peripheral nervous system, which extends throughout the body into the arms, legs, hands and feet.

112.     The peripheral nervous system is comprised of, inter alia, motor nerves, which carry signals from the brain to the muscles, causing them to contract, and sensory nerves, which inform us of our environment by allowing us to feel sensations such as touch, vibration, pain, and position. Each nerve within the peripheral nervous system is itself a bundle of smaller nerve fibers, with each nerve fiber consisting of individual axons. Sensory axons are tube-like structures spanning the length of the nerve fiber, and are responsible for carrying electrical signals generated by the fibers up the spinal cord and into the brain. The cell bodies of the peripheral sensory nerves lie in the dorsal root ganglia of the spinal cord, and project one axon towards the periphery (where they terminate either as free nerve endings in structures such as skin, muscle, joint capsules or in some

type of specialized sensory receptor, and one axon towards the spinal cord, where it is then relayed to the brain.

113.    Under normal circumstances, sensory cells of all types normally initiate Action Potentials (APs), also known as "evoked action potential" in the periphery in response to some type of stimulus (such as an electric shock"), where it is relayed to the spinal cord and then to higher brain centers for interpretation. When the voltage, or amplitude of the evoked action potential is recorded, that recording is referred to as "compound action potential," meaning, the sum of the evoked action potentials of each nerve fiber within the activated nerve. Simply put, peripheral nerves can be viewed as AP transmission pathways.

114.    On information and belief, there are different types of nerve fibers in a peripheral nerve. Sensory nerve fibers significantly vary in size, insulation (myelination) and corresponding speed of conduction. The nerve's largest and fastest fibers are known as A-Alpha and A-Beta fibers, both of which are responsible for carrying sensory information to the brain related to touch, vibration and position. The majority of the other fibers in a typical nerve, however, are small, slow-conducting fibers that transmit feelings of pain. Some of these slow-conducting pain fibers are known as C-fibers, and the remainder are known as A-Delta fibers. A-Delta fibers are responsible for carrying the initial sharp, bright pain sensations to the brain. When sharp initial pain begins to fade, the subsequent dull aching or burning pain is carried by the C-fibers.

115.    On information and belief, at all relevant times mentioned herein, the Defendants purported to selectively stimulate a Covered Person's nerve's A-Delta fibers through pf-NCS Testing in order to diagnose abnormalities within the nerves.

116.    The speed, or velocity with which a nerve fires is proportional to its diameter and the nature of its myelin covering.  Conversely, the intensity of an electrical stimulus required to

cause a fiber to activate is inversely proportional to its diameter. Thus, the intensity of electrical shock required to excite the C or A-Delta pain fibers is at least four times that required to stimulate the significantly larger A-Beta fibers.

117.   The amount of external stimulus (amplitude) that must be applied to a nerve before it fires is different than the amplitude of the nerve's resulting compound action potential. The stimulus threshold is the amount of external electricity that must be delivered to a nerve fiber before it fires. In contrast, the amplitude of the nerve's compound action potential represents the strength of the nerve's response to that external shock.

118.   The other factor determining the susceptibility of a nerve fiber to fire, aside from the intensity of an external shock, is the distance of the fiber from the source of the shock. Fibers closer to the source of the shock receive more current, and therefore reach their stimulus threshold (i.e., the amplitude required to generate a response) sooner than the fibers on the opposite side of the nerve. As the amplitude of the stimulus is gradually increased, more of the fibers begin to activate until all of the fibers capable of activation, are activated.

119.   At the lowest amplitude level, the only fibers that activate are the large-diameter A-Alpha fibers. As the intensity of the stimulus increases, more A-Alpha, and some A-Beta (touch/pressure) fibers begin to activate.

120.   The point at which all the fibers including the smallest A-Delta and C-fibers are eventually activated is referred to as "maximal stimulation," meaning the point at which all functioning fibers within a nerve are being simultaneously activated.

121.   On information and belief, activation of the A-Delta fibers requires a level of stimulus that will be perceived by the subject as painful as opposed to the "slight tickle" called for in the pf-NCS testing protocol.

**B.  Diagnosing Nerve Abnormalities**

122.    On information and belief, in furtherance of the scheme to defraud alleged herein, the Defendant Chiropractors purportedly performed pf-NCS Testing on the Covered Persons in order to diagnose nerve abnormalities.

123.    Abnormalities in the peripheral nerves are known as neuropathies. There are several methods for diagnosing the existence, nature, extent, and specific location of these abnormalities, including but not limited to standard Nerve Conduction Studies ("NCS") and Quantitative Sensory Testing ("QST").

124.    NCS are the standard and most widely accepted methods for testing the health and integrity of the peripheral nerves; that is, for recording the compound action potential resulting from an electrical stimulus.

125.    The amount of electricity measured by the recording electrodes over time creates a nerve response waveform that is displayed on a computer monitor attached to the testing device. From the waveform, which is produced in real-time, the (i) amplitude, (ii) latency, and (iii) conduction velocity of the nerve's compound action potential can be measured. Based on the measurements, the electrodiagnostic specialist determines whether a peripheral neuropathy exists (or diagnoses peripheral neuropathy).

126.    Needle EMGs are another standard NCS that is used to evaluate motor nerve, but not sensory nerve, abnormalities. EMGs involve the insertion of needles into various muscles in order to measure electrical activity within each muscle. The sound and appearance of that activity is then compared with well-defined norms to detect the existence of any motor neuropathies. For diagnostic purposes, EMGs and NCVs are typically performed together.

127.   Standard neurological diagnostic devices (EMG/NCV machines) record the sensory nerve fiber's response to an external stimulus over a measured distance, from the stimulating electrode to the recording electrode placed at a measured distance away along the same peripheral sensory nerve pathway. Upon introduction of the stimulus, the action potentials of the faster conducting fibers speed ahead of the slower pain fibers over the predefined distance. During this process, the electrical activity of the faster fibers reach the recording electrode first which, in turn, allows for an assessment of the electrical contributions of each type of fiber as their evoked action potentials progressively reach the recording electrode.

128.   Specialized computer software allows for a visualization of the relative electrical contribution that each type of fiber has on the overall nerve's compound action potential. Because the A-Delta and C-fibers are the slowest, it takes the longest amount of time for their electrical contribution to arrive at the distant recording electrode. Because of their small diameter and the tiny amount of their electrical contribution to the overall compound action potential, the contribution of the A-Delta and C pain fibers is virtually undetectable by the recording electrode on a standard EMG/NCV machine; their contribution can only be detected and measured by highly sensitive experimental equipment recording from electrodes placed directly within the sensory nerve.

129.   During a standard EMG/NCV, the entire peripheral nerve is stimulated using a supramaximal electrical stimulus, which causes an action potential of all nerve fibers (Sensory Nerve Action Potential, or SNAP).  The stimulus is usually given at a rate of 1/second (1 Hz), with stimulus duration of 100-200 milliseconds (0.1-0.2 seconds).  The SNAP is recorded at a distant site, over the nerve being tested, and is evaluated for distal latency and/or velocity (speed of conduction), as well as amplitude (height of response) and configuration (shape of response).  All

of the sensory nerve fibers contribute to the SNAP, but the calculated conduction velocity (or speed of conduction) is dominated by the larger, myelinated fibers.  Therefore, it is generally accepted that standard NCS are primarily measuring the function of the A Alpha fibers.  Patient input is not needed during any portion of standard EMG/NCV study.

130.    On information and belief, CPT Code 95904 is reserved exclusively for sensory Nerve Conduction Velocity Testing.

131.    On information and belief, in order to be eligible for reimbursement under CPT Code 95904, the billed for electrodiagnostic test must measure a nerve's amplitude, latency configuration and velocity.

132.    Since a standard sensory NCS is capable of recording the configuration of the evoked action potential and measuring the amplitude and the velocity/latency of a nerve's response, those tests are reimbursable pursuant CPT Code 95904.

133.    On information and belief, at all relevant times mentioned herein, Nerve Conduction Studies capable of measuring the amplitude and the velocity/latency of a sensory nerve's response are the only type of neurological diagnostic testing reimbursable pursuant to CPT Code 95904.

134.    Separate and apart from NCS, Quantitative Sensory Testing ("QST"), also known as Sensory Nerve Conduction Testing ("sNCT"), is a form of testing which purports to diagnose sensory peripheral neuropathies by identifying areas of relative numbness by stimulating the skin with different intensities of stimulus and asking the subject to indicate when they feel the stimulus (a psychophysical response from the person being tested). QST is entirely dependent upon the subject's subjective, psychophysical recognition of a stimulus applied to a physical area.  When

QST is performed with an electric device, it is often referred to as "Sensory Nerve Conduction Threshold Testing" ("sNCT Testing").

135.    Current Perception Threshold Testing ("CPT Testing") and pf-NCS Testing are both forms of sNCT Testing which are performed by administering an electrical current to specific sites through electrodes placed on the surface of the skin, and identifying the minimum electrical stimulus necessary for the subject to perceive the stimulus and indicate that they feel the stimulus. These tests serve only to confirm the patient's subjective complaints of numbness and are not capable of providing any diagnostic information concerning the nature of the abnormalities in the nerves. They can be useful in the clinical setting to track the progression and severity of the patient's numbness in progressive conditions such as diabetic peripheral neuropathy.

136.    pf-NCS Testing purports to measure the voltage intensity entering the body from the testing device, and consequently, the intensity of the stimulus necessary to elicit a discernable nerve impulse in order to purportedly diagnose peripheral neuropathies.

137.    On information and belief, QST devices, in general, and the Axon-II used by Defendants, in particular, are incapable of recording the configuration of the evoked response or of measuring the amplitude, latency or velocity of the subject's nerve response.

**C.  Background of the Axon-II**

138.    On information and belief, Axon-II's predecessor, the Medi-DX 7000 ("Medi-DX") received FDA marketing clearance on or about December 1, 1997, for use as a Current Perception Threshold ("CPT") device.

139.    Food and Drug Administration (FDA) marketing clearance for the Medi-DX was predicated on, inter alia, statements by its manufacturer to the FDA that the Medi-DX: (i) was a device to be used as a diagnostic device for the quantitative detection of sensory neurological

impairment in any individual capable of communicating their perception of cutaneous sensation; and (ii) was essentially equivalent to the Neurometer, a different CPT device manufactured by Neurotron, Inc., which had FDA approval as an evoked response electrical stimulator used to apply an electrical stimulus to a patient by means of surface electrodes for the purpose of measuring the evoked response.

140.    On information and belief, to perform a test with the Medi-DX, an electrode is held against the subject's skin in a designated location, and the subject is directed to verbally indicate when they feel the "slightest tickle." If no sensation is felt by the subject, the intensity of the electrical current applied to the skin is increased by turning a dial on the Medi-DX until the subject indicates that they feel the electrical stimulus. The intensity of the electrical current applied by the Med-DX at the time the subject first indicates that they feel sensation is then manually recorded on a datasheet.

141.    As indicated by its FDA categorization as an evoked response stimulator, the Medi-DX does not, and cannot, record or display the bioelectric signals produced by muscles or nerves or quantify any physiologic parameters.  Instead, its only purpose is to stimulate the nerve and produce an evoked response. It does not actually measure the evoked response, and accordingly, does not allow for the diagnosis or prognosis of neuromuscular disease.

142.    Since the Medi-DX is incapable of measuring the evoked response of a nerve, as is necessary for the diagnosis or prognosis of neuromuscular disease, on or about July 8, 2003, the Center for Medicare Services ("CMS") issued a Memorandum in which it concluded that testing performed with the Medi-DX is neither reasonable nor necessary for the diagnosis of sensory or peripheral neuropathies and is not reimbursable under the Medicare program using CPT Code 95904.

143.    In addition, effective April 1, 2004, based on a reconsideration of current Medicare policy for sNCT, CMS concluded that the use of any type of sNCT device (e.g., "current output" type device used to perform current perception threshold (CPT), pain perception threshold (PPT), or pain tolerance threshold (PTT) testing or "voltage input" type device used for voltage-nerve conduction threshold (v-NCT) testing) to diagnose sensory neuropathies or radiculopathies in Medicare beneficiaries is not reasonable and necessary."

144.    On information and belief, CMS continues to hold the position, under Nationally Non-covered Indications (Section 160.23, C.) that "all uses of sNCT to diagnose sensory neuropathies or radiculopathies are non-covered."

145.    Subsequent to the 2003 CMS Memorandum, Neuro-Diagnostic Associates, the manufacturer of the Medi-DX, was renamed Pain-DX, Inc., and the Medi-DX device was rebranded as the "Axon-II."  The Axon-II was marketed with a separate device called the "Neural-Scan Potentiometer" (or "Potentiometer").

146.    On information and belief, with the exception of the bundling of the Potentiometer, the Medi-DX and the Axon-II are substantively identical.

147.    On information and belief, the Neural-Scan Potentiometer sold with the Axon-II is an electrical voltage meter biofeedback device invented, designed and manufactured by The Prometheus Group. It is incapable, either when used alone or in tandem with the Medi-DX or Axon-II, of performing the essential components of a sensory nerve conduction study required by AMA pursuant to CPT Code 95904.

148.    On information and belief, the Potentiometer is used by placing electrodes on a Covered Person's skin in designated locations for each testing site.  As the Medi-DX or Axon-II

stimulus is applied, a digital reading of the millivolts of such stimulus, plus other background noise is displayed on the Potentiometer.

149.     On information and belief, in furtherance of the scheme to defraud alleged herein, the Potentiometer purports to display an increase in its reading of 20 millivolts or more just before the stimulus threshold when the patient perceives the "slight tickle," or purported current perception threshold stimulus of the A-Delta fiber. The 20 millivolts or more increase in the Potentiometer reading is purportedly a result of the additional current contributed by the activation of the A-Delta fibers to the sensory nerve compound action potential.

150.     On information and belief, notwithstanding that the pf-NCS Testing is supposed to elicit a response from a Covered Person's A-Delta pain fibers, the Axon-II protocol requires that the patient receive an electrical stimulus characterized as no more than a "slight tickle."

151.     On information and belief, the A-Delta fibers are not activated by an electrical stimulus that is only strong enough to be characterized by the Covered Person as no more than a "slight tickle," but require a stronger stimulus that the Covered Person will perceive as painful and/or greater than a "slight tickle."

152.     On information and belief, even if it could selectively detect activation of the A-Delta fibers, the Potentiometer is still incapable of obtaining, recording, or displaying any information related to the activation of the sensory nerve (i.e., the sensory compound action potential) or the activation of the A-Delta fibers.  It provides none of the essential information required to perform medically useful analysis of the action potential of a firing nerve.

153.     On information and belief, detection of the action potential, even if it was possible with the Potentiometer, provides no information about the normality or abnormality of a Covered Person's A-Delta fibers. Furthermore, the Potentiometer uses only surface electrodes rather than

intraneural electrodes which are necessary to record the faint activity of the A-Delta fibers, assuming that the Potentiometer even has the electrical capabilities of such measurements, which it does not.

154.    On information and belief, because the only "quantitative" element in the Medi-DX and Axon-II testing is the intensity of the stimulus according to the position of the stimulus dial on the machine, then recognition of the stimulus, with or without the Potentiometer, can only be considered a psychophysical test.  It is a test that depends totally on the interaction between the application of a physical, graded stimulus to a subject and the subject's corresponding identification of the minimum perception threshold (sensation) resulting from the stimulus.

155.    On information and belief, the Axon-II System is incapable of measuring the stimulus thresholds of A-Delta fibers, and is incapable of measuring the amplitude of the compound action potential that travels along a nerve.

156.    On information and belief, the Axon II is incapable of selectively stimulating and/or evaluating A-delta pain fiber nerve function.  Instead, the Axon II (and potentiometer) measure only stimulus artifact.

157.    On information and belief, even if the Potentiometer was capable of measuring the amplitude of the compound action potential that travels along a nerve, it is incapable of selectively measuring the compound action potential of A-Delta fibers.

158.    At all relevant times mentioned herein, in furtherance of the scheme to defraud, the Defendants falsely and fraudulently submitted boilerplate patient reports to Liberty Mutual which stated that the psychophysical response elicited by the Axon-II was verified by the Potentiometer.

159.    On information and belief, the pf-NCS Testing performed by Defendants was psychophysical and excluded from coverage pursuant to CPT Code 95904, as the measurements

on which a subject's report is based requires the presentation of graded stimuli and the psychophysiological perception by the patient of the stimulus.

160.    At all relevant times mentioned herein, the pf-NCS Testing purportedly performed by the Defendants was not reimbursable pursuant to CPT Code 95904.

**D.  Fraudulent Billing using CPT Codes 95904 and 95999**

161.    Pursuant to Section 5108 of the Insurance Law, the New York State Department of Financial Services, formerly the Department of Insurance, has adopted the Official New York Workers' Compensation Board Medical Fee Schedule ("Fee Schedule"), which sets forth the charges for professional health services that are reimbursable under the No-fault Law.  The Fee Schedule incorporates the CPT codes, as well as the coding rules and regulations, published by the American Medical Association (the "AMA") in the Current Procedural Terminology ("CPT") Code Book.  The CPT Code Book is the definitive medical source used by licensed medical professionals to accurately describe, among other things, medical and diagnostic services performed and billed to third-party payors, such as insurance companies.

162.    On information and belief, at all relevant times mentioned herein, the Defendants, as a matter of procedure, practice, and protocol, routinely and fraudulently billed Liberty Mutual for pf-NCS Testing purportedly performed on Covered Persons using CPT Code 95904, which is the CPT code for a "Nerve conduction, amplitude and latency/velocity study, each nerve; sensory," or a sensory nerve conduction velocity study. In the CPT Assistant of April 2002, the following description of the procedures necessary for CPT Code 95904 was given:

> Sensory NCSs (95904) are performed by applying electrical stimulation near a nerve and recording the response from a distant site along the nerve. Response parameters include amplitude, latency, configuration, and Sensory conduction velocity.

163.    In addition, the AMA specifies that NCS reports should document the nerves evaluated, the distance between the stimulation and recording sites, conduction velocity, latency values and amplitude. On information and belief, none of these five essential elements that define a valid nerve conduction study is optional, and failure to measure and document all of these essential parameters makes a study ineligible for billing under CPT Code 95904.

164.    On or about February 14, 2002, the CMS issued a Decision Memorandum ("the 2002 Memorandum") setting forth the basis for its decision to issue a Non-Coverage Decision concerning the ineffectiveness of QST, in general, and QST performed using a CPT device manufactured by Neurotron and known as a Neurometer, in particular.  The 2002 Memorandum determined that QST is neither reasonable nor necessary for the diagnosis of sensory or peripheral neuropathies because it is not clinically effective, and for that reason, its use is not covered under the Medicare program.

165.    On or about July 8, 2003, CMS issued a second Decision Memorandum ("the 2003 Memorandum") reaffirming the conclusions it reached in 2002 regarding the Neurometer, and expanding the scope of such conclusions to specifically include pf-NCS Testing performed with the Medi-DX. The Non-Coverage Decision formally memorializing the 2003 Memorandum became effective on April 1, 2004.

166.    With regard to pf-NCS Testing, in general, and pf-NCS Testing performed with the Medi-DX in particular, the 2003 Memorandum determined, among other things, that: (i)  CPT Code 95904 is reserved only for standard NCS; (ii) QST, in general, and pf-NCS Testing, in particular, is incapable of providing information on the amplitude, latency or velocity of a nerve response such as is provided during a standard NCS; and (iii) there is no evidence to suggest that pf-NCS Testing is reasonable and/or necessary for diagnosing sensory or peripheral neuropathies.

167.    On information and belief, effective July 1, 2005, the AMA assigned CPT Category III Code 0110T to pf-NCS Testing.  Category III codes are a set of temporary codes that allow for data collection on emerging technology, services and procedures.  These codes are intended to be used for data collection to substantiate widespread usage or to provide documentation for the FDA approval process.

168.    On information and belief, the assignment of a Category III Code to a procedure does not imply or endorse clinical efficacy of that procedure, and the Fee Schedule provides that all Category III Codes are "By Report" (BR) procedures, meaning that to the extent that a Category III procedure is reimbursable, an "operative report" of the procedure is required.

169.    On information and belief, the Fee Schedule mandates that bills for Category III procedures not accompanied by the required operative report are to be deemed not properly submitted, unless and until an operative report is received by the payer.

170.    On or about January 7, 2008, CMS reiterated and clarified that pf-NCS Testing must be billed using CPT Category III 0110T, and not using CPT Code 95904.

171.    Moreover, the AMA provided further clarification in the May, 2011 edition of the CPT Assistant, wherein it unambiguously indicated that billing under CPT Code 95904 requires measurement of the subject's amplitude, latency and velocity, none of which the Axon-II can measure.

172.    At all relevant times mentioned herein, the Defendants falsely and fraudulently misrepresented that the Axon-II System objectively measured amplitude so that they could bill pursuant to CPT Code 95904, when in fact, the Axon-II' internal analyses are based purely on a reading of the intensity of the external shock being introduced from a device, and not the objective

amplitude of the nerve's compound action potential resulting from that external shock, as is required to bill under CPT Code 95904.

173.    On information and belief, Defendants, including but not limited to Chiropractic Performance Services, P.C., Crosstown Chiropractic, P.C., Dynamic Healthcare Center, LLC, JC Chiropractic, PLLC., Modern Chiropractic Solutions, LLC, Nassau Chiropractic Services, P.C., and Spinal Pro Chiropractic, P.C., with the intent to fraudulently induce Liberty Mutual into reimbursing the maximum amount of dollars for unnecessary pf-NCS Testing, billed Liberty Mutual for such services using CPT Code 95904,

174.    In addition to fraudulently billing pursuant to CPT code 95904, Defendants, including but not limited to Chiropractic Performance Services, P.C., Crosstown Chiropractic P.C. and New York Core Chiropractic, P.C. routinely billed Plaintiffs pursuant to CPT Code 95999, which is reserved for "unlisted neurological or neuromuscular diagnostic procedures," when in fact, such services, if reimbursable at all, were required to be billed pursuant to CPT Category III Code 0110T.

175.    The billing of pf-NCS Testing pursuant to CPT Code 95999 was a knowing misrepresentation of the facts.

E.  **Unnecessary pf-NCS Testing and Fraudulent Misrepresentations**

176.    On information and belief, pf-NCS Testing is not required for the diagnosis or treatment of injuries caused by motor vehicle accidents, such as radiculopathy, plexopathy and nerve entrapment, all which can be diagnosed with the standard methods of neurological examination and/or standard EMG/NCV testing.

177.    On information and belief, Defendants sought reimbursement of No-fault benefits from Liberty Mutual through the submission of medical records, reports and bills which contained

false and material misrepresentations as to medical necessity of the pf-NCS Testing and the actual services rendered.

178.    On information and belief, in order to obfuscate the fact that the billed for pf-NCS Testing was medically unnecessary, not rendered as billed and/or of no diagnostic value, Defendants made material misrepresentations in documentation submitted in support of their claims for reimbursement.

179.    On information and belief, demonstrative of the fact that the pf-NCS purportedly performed by Defendants was fraudulent, the clinical presentation of Covered Persons, as documented in Defendants' own medical records, was routinely inconsistent with the reported results of the pf-NCS Testing. By way of example and not limitation, in numerous instances, Defendants reported neurologic examination would be documented as normal, with no complaints of pain, numbness of tingling by Covered Persons, while the related pf-NCS Testing reports identified evidence of radiculopathy at multiple levels.

180.    By way of further example and not limitation, in numerous instances, Defendants' reported abnormal findings in Covered Persons' medical reports did not correlate with accompanying graphs, which purported to provide objective evidence of the A-delta pain sensory nerve fiber response.

     **1.**    **Presumptive Diagnosis**

181.    On information and belief, Defendants, including but not limited to  Chiropractic Performance Services, Dynamic Healthcare Center, JC Chiropractic, Modern Chiropractic Solutions, Nassau Chiropractic Services, and New York Core Chiropractic routinely misrepresented in bogus medical reports submitted to Liberty Mutual in support of claims for reimbursement that Covered Persons had a "Presumptive Diagnosis (or reason why the pf-NCS

Testing was being performed) of "cervical plexopathy without motor deficit," and/or "lumbosacral plexopathy without motor deficit," or substantially similar language.

182.   On information and belief, plexopathy is an injured or disordered condition of a plexus and especially a nerve plexus.

183.   On information and belief, Defendants, including but not limited to Chiropractic Performance Services, Dynamic Healthcare Center, JC Chiropractic, Modern Chiropractic Solutions, Nassau Chiropractic Services, and New York Core Chiropractic included "cervical plexopathy without motor deficit," and/or "lumbosacral plexopathy without motor deficit," or substantially similar language as a presumptive diagnosis in their medical reports to indicate that pf-NCS Testing was being performed in order to evaluate for the possibility of a cervical or lumbosacral plexopathy that has resulted in injury or damage to the sensory fibers, but not to the motor fibers.

184.   On information and belief, there is no such thing as a plexopathy involving exclusively sensory fibers, without motor deficit.

185.   On information and belief, cervical plexopathy and lumbosacral plexopathy involve injury to major peripheral nerves, which carry both motor and sensory nerve fibers of all types and sizes.

186.   On information and belief, it would be an anatomic and physiologic impossibility to injure only the sensory nerve fibers of a plexus without injuring the motor nerves.

187.   On information and belief, Defendants' representations that pf-NCS Testing is useful for evaluating a presumptive diagnosis of "cervical" or "lumbosacral plexopathy without motor deficit" were knowing and willful misrepresentation of the facts designed to induce

Plaintiffs into paying for pf-NCS Testing that was not performed as billed, was medically unnecessary and/or was of no diagnostic value.

      2.    **Electrode Distances**

188.    On information and belief, Defendants, including but not limited to Defendant Nassau Chiropractic Services, P.C. routinely misrepresented in bogus medical reports submitted to Liberty Mutual in support of claims for reimbursement that Covered Persons that "electrode distances" were measured in connection with the pf-NCS Testing purportedly provided to Covered Persons.

189.    On information and belief, "electrode distances" refer to the distance between the stimulating probe of the Axon-II, which is placed over various reference points on the skin, and the recording potentiometer electrode, which is placed over the spine (cervical or lumbar), and should very from patient to patient depending on their size.

190.    On information and belief, one or more Defendants, including but not limited to Defendant Nassau Chiropractic Services routinely fabricated the measurements of electrode distances indicated on pf-NCS reports submitted to Liberty Mutual in connection with claims for reimbursement.

191.    By way of example and not limitation, for cervical studies, Defendants, including but not limited to Nassau Chiropractic Services routinely indicated electrode distances as follows: Radial, Median, Ulnar: 60cm; Axillary: 20cm; Medial Cutaneous: 30cm; and Suprascapular: 15cm. By way of further example and not limitation, for lumbosacral studies, Defendants routinely listed electrode distances as follows: Lat. Femoral Cut.: 60cm; Femoral: 75cm; Saphen, Peroneal, Sural: 115cm; and ns Post. Femoral: 90cm.

192.    Notwithstanding that such distances should vary, the electrode distances contained in the pf-NCS testing reports submitted by Defendants were routinely the same across all patients, meaning one of two thing: that either every single patient had the exact same body type as each other, or that the distances were not actually measured (in other words, the distances are fabricated). It is a virtual impossibility that every single patient examined, male and female, had the exact same body type requiring the exact same distances between stimulating and recording electrodes, and therefore, the electrode distances contained in the pf-NCS testing reports submitted by Defendants were fabricated and a knowing and willful misrepresentation of the facts intended to induce payment from Liberty Mutual.

193.    On information and belief, the electrode distances indicated by Defendants, including but not limited to Nassau Chiropractic Services did not include all of the nerves purportedly studied by pf-NCS Testing on Covered Persons on reports submitted to Plaintiffs in support of reimbursement.

194.    Therefore, these numbers are likely fabricated, making this a knowing and willful misrepresentation of the facts.

**3.    pf-NCS Graphs Misrepresented as Showing Nerve Conduction Velocity**

195.    On information and belief, Defendants, including but not limited Crosstown Chiropractic, New York Core Chiropractic, and Spinal Pro Chiropractic included printed graphs with their reports submitted to Plaintiffs in support of reimbursement which misrepresented that the pf-NCS Testing measured nerve conduction velocity/latency (Vel./Lat.), when in fact, it did not.

196.    On information and belief, velocity, or speed, is a measure of distance over time.

197.    In electrodiagnostic medicine, velocity is measured as meters per second (m/s), and to measure the conduction velocity of a nerve, one must know the time and distance it takes for a nerve impulse to travel from one point in a nerve to another point.

198.    In electrodiagnostic medicine, distal peak or onset latency can also be a measure of conduction speed, or velocity, but only because certain studies are performed at standard distances, so the distances are already known. By way of example and not limitation, when performing a standard antidromic median sensory nerve conduction study at the wrist, the stimulus point is 14 cm proximal to the recording over the nerve at the finger. Because the distance is fixed, the time it takes to get from point A to point B (distal latency) is a useful and valid measure of conduction speed. Therefore, a distal latency is only valid if the standard distance is used (and recorded on the report). Notwithstanding the foregoing, in the graphs submitted by Defendants in connection with their claims for reimbursement, which are clearly labeled as measuring velocity and/or latency, there are no measurements of distance, making it impossible to measure velocity, or speed.

199.    Therefore, these graphs misrepresent that they are measuring the nerve conduction velocity/latency.

### 4.    The Potentiometer Allows a Precise and Objective Measurement of the Action Potential of the Nerve Firing

200.    On information and belief, Defendants, including but not limited to Chiropractic, New York Core Chiropractic, and Spinal Pro Chiropractic, routinely represented in reports submitted to Plaintiffs in support of reimbursement that the Potentiometer allows a precise and objective measurement of the action potential of the nerve firing.

201.    On information and belief, pf-NCS Testing in general, and the Potentiometer in particular, are incapable of recording A-delta pain sensory nerve responses.

202.     Therefore, Defendants' statement that the Potentiometer allows a precise and objective measurement of the action potential of the nerve firing was a representation of facts that they knew, or should have known was untrue.

### DISCOVERY OF THE FRAUD

203.     Based upon Defendants' material misrepresentations and other affirmative acts to conceal their fraud from Liberty Mutual, Liberty Mutual did not discover and should not have reasonably discovered that its damages were attributable to fraud until shortly before they filed this Complaint.

### STATEMENT OF CLAIMS

### FIRST CLAIM FOR RELIEF

### AGAINST ANTHONY DESANO, D.C.

### (RICO, pursuant to 18 U.S.C § 1962(c))

204.     The allegations of paragraphs 1 through 203 are hereby repeated and re-alleged as though fully set forth herein.

### THE RICO ENTERPRISE

205.     At all relevant times mentioned herein, Chiropractic Performance Services, P.C. was an "enterprise" engaged in, or the activities of which affect, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

206.     From in or about 2014 through the date of the filing of this Complaint, Defendant Desano conducted and participated in the affairs of the Chiropractic Performance Services, P.C. enterprise through a pattern of racketeering activity, including the many acts of mail fraud described herein, in the representative list of predicate acts set forth in the Appendix accompanying

this Complaint, all of which are incorporated by reference. Defendant's conduct constitutes a violation of 18 U.S.C. § 1962(c).

207.    At all relevant times mentioned herein, Desano participated in the affairs of the Chiropractic Performance Services, P.C. enterprise through a pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted fraudulent bills and supporting documents to Plaintiffs Liberty Mutual Fire Insurance Company, American States Insurance Company, LM General Insurance Company and LM Insurance Corporation that were based, in part, on pf-NCS Testing that was not rendered as billed, fabricated, medically unnecessary and/or of no diagnostic value.

## THE PATTERN OF RACKETEERING ACTIVITY

### (Racketeering Acts)

208.    The racketeering acts set forth herein were carried out on a continued basis over more than a 5 1/2 year period, were related and similar, and were committed as part of Desano's ongoing scheme to fraudulently bill for pf-NCS Testing to defraud insurers and, if not stopped, will continue into the future.

209.    On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, inasmuch as Chiropractic Performance Services, P.C. continues to pursue collection on the fraudulent billing to the present day.

210.    As a part of the pattern of racketeering activity, and for the purpose of executing the scheme and artifice to defraud as described above, Desano caused mailings to be made through the United States Postal Service, in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Liberty Mutual Fire Insurance Company, American States Insurance Company, LM General Insurance Company, and LM Insurance Corporation, and

to induce them to issue checks to the Chiropractic Performance Services, P.C. enterprise based upon materially false and misleading information.

211.    Through the Chiropractic Performance Services, P.C. enterprise, Desano submitted fraudulent claim forms seeking payment for pf-NCS Testing that was not performed as billed and/or fabricated and/or of no diagnostic value. The bills and supporting documents that were sent by and/or on behalf of Desano and/or others acting under his direction and control, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service. By virtue of those activities, Desano engaged in a continuous series of predicate acts of mail fraud, extending from the formation of the Chiropractic Performance Services, P.C. enterprise through the filing of this Complaint.

212.    A representative sample of predicate acts, set forth in the accompanying Appendix, identifies the nature and date of mailings that were made by or on behalf of Desano in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

213.    Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(b).

214.    Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

**Damages**

215.    By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Liberty Mutual Fire Insurance Company, American States Insurance Company, LM General Insurance Company, and LM Insurance Corporation have been injured in their business and property and been damaged in the aggregate amount presently in excess of $49,000, the exact amount to be determined at trial.

216.     Pursuant to 18 U.S.C. § 1964(c), Plaintiffs Liberty Mutual Fire Insurance Company, American States Insurance Company, LM General Insurance Company, and LM Insurance Corporation are entitled to recover from Anthony Desano, three-fold damages sustained by them, together with the costs of this lawsuit and reasonable attorneys' fees.

### SECOND CLAIM FOR RELIEF

### <u>AGAINST CHIROPRACTIC PERFORMANCE SERVICES, P.C.<br>AND ANTHONY DESANO, D.C.</u>

### (Common Law Fraud)

217.     The allegations of paragraphs 1 through 203 are hereby repeated and re-alleged as though fully set forth herein.

218.     Defendants Chiropractic Performance Services and Desano intentionally, knowingly, fraudulently, and with an intent to deceive Plaintiffs Liberty Mutual Fire Insurance Company, Liberty Insurance Corporation, American States Insurance Company, LM General Insurance Company, and LM Insurance Corporation, made numerous false and misleading statements of material fact as to the necessity of the medical services purportedly rendered and that the medical services were provided when, in fact, they were not, thereby inducing Plaintiffs Liberty Mutual Fire Insurance Company, Liberty Insurance Corporation, American States Insurance Company, LM General Insurance Company, and LM Insurance Corporation to make payments to Defendants that Defendants were not entitled to because of their fraudulent nature. As part of the fraudulent scheme implemented by Desano, Chiropractic Performance Services made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiffs Liberty Mutual Fire Insurance Company, Liberty Insurance Corporation, American States Insurance Company, LM General Insurance Company and LM Insurance Corporation for payment.

219.    Defendants Chiropractic Performance Services and Desano intentionally, knowingly, fraudulently, and with the intent to commit and facilitate billing fraud and deceive Plaintiffs Liberty Mutual Fire Insurance Company, Liberty Insurance Corporation, American States Insurance Company, LM General Insurance Company, and LM Insurance Corporation, concealed the fact that the bills submitted to them for reimbursement of No-fault benefits for services relating to the performance of pf-NCS Testing were misrepresented.

220.    Defendants Chiropractic Performance Services and Desano intentionally, knowingly, fraudulently, and with the intent to commit and facilitate billing fraud and deceive Plaintiffs Liberty Mutual Fire Insurance Company, Liberty Insurance Corporation, American States Insurance Company, LM General Insurance Company, and LM Insurance Corporation, concealed the fact that, in many instances, the services relating to pf-NCS Testing were of no diagnostic value.

221.    Defendants Chiropractic Performance Services and Desano intentionally, knowingly, fraudulently, and with the intent to commit and facilitate billing fraud and deceive Plaintiffs Liberty Mutual Fire Insurance Company, Liberty Insurance Corporation, American States Insurance Company, LM General Insurance Company, and LM Insurance Corporation, concealed the fact that the services, if provided at all, were provided pursuant to a protocol that was intended to maximize Defendants' profit and reimbursement of payments from Plaintiffs Liberty Mutual Fire Insurance Company, Liberty Insurance Corporation, American States Insurance Company, LM General Insurance Company, and LM Insurance Corporation , as opposed to medical necessity.

222.    On information and belief, Defendants intentionally, knowingly, fraudulently, and with the intent to deceive, submitted patient medical records, reports, treatment verifications and

bills for medical treatment which contained false representations of material facts, including but not limited to the following fraudulent material misrepresentations:

- False and misleading statements contained in medical reports that Defendants selectively detected the activation of a Covered Person's nerve's A-Delta fibers, when in fact they did not.

- False and misleading statements contained in bills for pf-NCS Testing submitted to Plaintiffs that the Defendants performed Nerve Conduction Studies on Covered Persons which were reimbursable pursuant to CPT Codes 95904 and/or 95999, when in fact they did not.

- False and misleading statements and information designed to conceal the fact that the treatment and pf-NCS Testing provided for a Covered Person's purported injury were not rendered as billed, fabricated, medically unnecessary and/or of no diagnostic value.

- False and misleading statements exaggerating and/or falsifying the clinical usefulness of pf-NCS Testing for the treatment of the purported injuries suffered by Covered Persons.

- False and misleading statements concealing the fact that the pf-NCS Testing was rendered to Covered Persons pursuant to a fraudulent protocol and predetermined course of treatment intended to maximize Defendant's profit and reimbursement of payments.

- False and misleading test results, reports and bills that sought reimbursement for pf-NCS Testing when, in fact, in many instances, such services were not rendered as billed; and

- Other misrepresentations, including but not limited to those contained in paragraphs 1 through 203 above.

223.    On information and belief, in numerous instances, the medical records, reports and bills submitted by Defendants to Plaintiffs Liberty Mutual Fire Insurance Company, Liberty Insurance Corporation, American States Insurance Company, LM General Insurance Company, and LM Insurance Corporation in connection with pf-NCS Testing set forth fictional findings, diagnoses and representations of the services provided. The false representations contained therein not only were intended to defraud Plaintiffs Liberty Mutual Fire Insurance Company, Liberty

Insurance Corporation, American States Insurance Company, LM General Insurance Company, and LM Insurance Corporation, but constitute a grave and serious danger to the Covered Persons and the consumer public, particularly if the sham and fictional diagnoses and test results were to be relied upon by any subsequent healthcare provider.

224.    The foregoing was intended to deceive and mislead Plaintiffs Liberty Mutual Fire Insurance Company, Liberty Insurance Corporation, American States Insurance Company, LM General Insurance Company, and LM Insurance Corporation into believing that Desano, through Chiropractic Performance Services was providing medically valid services when, in fact, he was not.

225.    Defendants knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiffs Liberty Mutual Fire Insurance Company, Liberty Insurance Corporation, American States Insurance Company, LM General Insurance Company, and LM Insurance Corporation to rely thereon.

226.    Plaintiffs Liberty Mutual Fire Insurance Company, Liberty Insurance Corporation, American States Insurance Company, LM General Insurance Company, and LM Insurance Corporation did in fact reasonably and justifiably rely on the foregoing material misrepresentations, which they were led to believe existed as a result of Defendants' acts of fraud and deception.

227.    Had Plaintiffs Liberty Mutual Fire Insurance Company, Liberty Insurance Corporation, American States Insurance Company, LM General Insurance Company, and LM Insurance Corporation known of the fraudulent content of, and misrepresentations in, the medical records, reports, treatment verifications, and bills for medical treatment, they would not have paid

Chiropractic Performance Services' claims for No-fault insurance benefits submitted in connection therewith.

228.    Furthermore, Defendants' far reaching pattern of fraudulent conduct evinces a high degree of moral turpitude and wanton dishonesty which, as alleged above, has harmed, and will continue to harm, the public at large, thus entitling Plaintiffs Liberty Mutual Fire Insurance Company, Liberty Insurance Corporation, American States Insurance Company, LM General Insurance Company, and LM Insurance Corporation to recovery of exemplary and punitive damages.

229.    By reason of the foregoing, Plaintiffs Liberty Mutual Fire Insurance Company, Liberty Insurance Corporation, American States Insurance Company, LM General Insurance Company, and LM Insurance Corporation have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $50,000, the exact amount to be determined at trial, plus interest, costs, punitive damages and other relief the Court deems just.

## THIRD CLAIM FOR RELIEF

## AGAINST CHIROPRACTIC PERFORMANCE SERVICES, P.C. AND ANTHONY DESANO, D.C.

### (Unjust Enrichment)

230.    The allegations of paragraphs 1 through 203 are hereby repeated and re-alleged as though fully set forth herein.

231.    By reason of their wrongdoing, Defendants Chiropractic Performance Services and Desano have been unjustly enriched, in that they have, directly and/or indirectly, received monies from Plaintiffs Liberty Mutual Fire Insurance Company, Liberty Insurance Corporation, American States Insurance Company, LM General Insurance Company, and LM Insurance Corporation that

are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

232.    Plaintiffs Liberty Mutual Fire Insurance Company, Liberty Insurance Corporation, American States Insurance Company, LM General Insurance Company, and LM Insurance Corporation are therefore entitled to restitution from Defendants Chiropractic Performance Services and Desano in the amount by which Defendants have been unjustly enriched.

233.    By reason of the foregoing, one or more Plaintiffs have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $50,000, the exact amount to be determined at trial, plus interest, costs and other relief the Court deems just.

**FOURTH CLAIM FOR RELIEF**

**<u>AGAINST ROSS FIALKOV, D.C.</u>**

**(RICO, pursuant to 18 U.S.C § 1962(c))**

234.    The allegations of paragraphs 1 through 203 are hereby repeated and re-alleged as though fully set forth herein.

**<u>THE RICO ENTERPRISE</u>**

235.    At all relevant times mentioned herein, Crosstown Chiropractic, P.C. was an "enterprise" engaged in, or the activities of which affect, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

236.    From in or about 2019 through the date of the filing of this Complaint, Defendant Fialkov conducted and participated in the affairs of the Crosstown Chiropractic, P.C. enterprise through a pattern of racketeering activity, including the many acts of mail fraud described herein, in the representative list of predicate acts set forth in the Appendix accompanying this Complaint,

all of which are incorporated by reference. Defendant's conduct constitutes a violation of 18 U.S.C. § 1962(c).

237.   At all relevant times mentioned herein, Fialkov participated in the affairs of the Crosstown Chiropractic, P.C. enterprise through a pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted fraudulent bills and supporting documents to Plaintiff LM General Insurance Company that were based, in part, on pf-NCS Testing that was not rendered as billed, fabricated, medically unnecessary and/or of no diagnostic value.

## THE PATTERN OF RACKETEERING ACTIVITY

### (Racketeering Acts)

238.   The racketeering acts set forth herein were carried out on a continued basis over more than a 1 year period, were related and similar, and were committed as part of Fialkov's ongoing scheme to fraudulently bill for pf-NCS Testing to defraud insurers and, if not stopped, will continue into the future.

239.   On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, inasmuch as Crosstown Chiropractic, P.C. continues to pursue collection on the fraudulent billing to the present day.

240.   As a part of the pattern of racketeering activity, and for the purpose of executing the scheme and artifice to defraud as described above, Fialkov caused mailings to be made through the United States Postal Service, in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud LM General Insurance Company, and to induce it to issue checks to the Crosstown Chiropractic, P.C. enterprise based upon materially false and misleading information.

241.     Through the Crosstown Chiropractic, P.C. enterprise, Fialkov submitted fraudulent claim forms seeking payment for pf-NCS Testing that was not performed as billed and/or fabricated and/or of no diagnostic value. The bills and supporting documents that were sent by and/or on behalf of Fialkov and/or others acting under his direction and control, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service. By virtue of those activities, Fialkov engaged in a continuous series of predicate acts of mail fraud, extending from the formation of the Crosstown Chiropractic, P.C. enterprise through the filing of this Complaint.

242.     A representative sample of predicate acts, set forth in the accompanying Appendix, identifies the nature and date of mailings that were made by or on behalf of Fialkov in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

243.     Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(b).

244.     Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

**Damages**

245.     By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiff LM General Insurance Company has been injured in their business and property and been damaged in the aggregate amount presently in excess of $7,000 , the exact amount to be determined at trial.

246.     Pursuant to 18 U.S.C. § 1964(c), Plaintiff LM General Insurance Company is entitled to recover from Fialkov, three-fold damages sustained by them, together with the costs of this lawsuit and reasonable attorneys' fees.

## FIFTH CLAIM FOR RELIEF

## AGAINST CROSSTOWN CHIROPRACTIC, P.C. AND ROSS FIALKOV, D.C.

### (Common Law Fraud)

247.    The allegations of paragraphs 1 through 203 are hereby repeated and re-alleged as though fully set forth herein.

248.    Defendants Crosstown Chiropractic and Fialkov intentionally, knowingly, fraudulently, and with an intent to deceive Plaintiff LM General Insurance Company, made numerous false and misleading statements of material fact as to the necessity of the medical services purportedly rendered and that the medical services were provided when, in fact, they were not, thereby inducing Plaintiff LM General Insurance Company to make payments to Defendants that Defendants were not entitled to because of their fraudulent nature. As part of the fraudulent scheme implemented by Fialkov, Crosstown Chiropractic made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiff LM General Insurance Company for payment.

249.    Defendants Crosstown Chiropractic and Fialkov intentionally, knowingly, fraudulently, and with the intent to commit and facilitate billing fraud and deceive Plaintiff LM General Insurance Company, concealed the fact that the bills submitted to them for reimbursement of No-fault benefits for services relating to the performance of pf-NCS Testing were misrepresented.

250.    Defendants Crosstown Chiropractic and Fialkov intentionally, knowingly, fraudulently, and with the intent to commit and facilitate billing fraud and deceive Plaintiff LM General Insurance Company, concealed the fact that, in many instances, the services relating to pf-NCS Testing were of no diagnostic value.

251.    Defendants Crosstown Chiropractic and Fialkov intentionally, knowingly, fraudulently, and with the intent to commit and facilitate billing fraud and deceive Plaintiff LM General Insurance Company, concealed the fact that the services, if provided at all, were provided pursuant to a protocol that was intended to maximize Defendants' profit and reimbursement of payments from Plaintiff LM General Insurance Company, as opposed to medical necessity.

252.    On information and belief, Defendants intentionally, knowingly, fraudulently, and with the intent to deceive, submitted patient medical records, reports, treatment verifications and bills for medical treatment which contained false representations of material facts, including but not limited to the following fraudulent material misrepresentations:

- False and misleading statements contained in medical reports that Defendants selectively detected the activation of a Covered Person's nerve's A-Delta fibers, when in fact they did not.

- False and misleading statements contained in bills for pf-NCS Testing submitted to Plaintiffs that the Defendants performed Nerve Conduction Studies on Covered Persons which were reimbursable pursuant to CPT Codes 95904 and/or 95999, when in fact they did not.

- False and misleading statements and information designed to conceal the fact that the treatment and pf-NCS Testing provided for a Covered Person's purported injury were not rendered as billed, fabricated, medically unnecessary and/or of no diagnostic value.

- False and misleading statements exaggerating and/or falsifying the clinical usefulness of pf-NCS Testing for the treatment of the purported injuries suffered by Covered Persons.

- False and misleading statements concealing the fact that the pf-NCS Testing was rendered to Covered Persons pursuant to a fraudulent protocol and predetermined course of treatment intended to maximize Defendant's profit and reimbursement of payments.

- False and misleading test results, reports and bills that sought reimbursement for pf-NCS Testing when, in fact, in many instances, such services were not rendered as billed; and

- Other misrepresentations, including but not limited to those contained in paragraphs 1 through 203 above.

253.    On information and belief, in numerous instances, the medical records, reports and bills submitted by Defendants to Plaintiff LM General Insurance Company in connection with pf-NCS Testing set forth fictional findings, diagnoses and representations of the services provided. The false representations contained therein not only were intended to defraud Plaintiff LM General Insurance Company, but constitute a grave and serious danger to the Covered Persons and the consumer public, particularly if the sham and fictional diagnoses and test results were to be relied upon by any subsequent healthcare provider.

254.    The foregoing was intended to deceive and mislead Plaintiff LM General Insurance Company into believing that Fialkov, through Crosstown Chiropractic was providing medically valid services when, in fact, he was not.

255.    Defendants knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiff LM General Insurance Company to rely thereon.

256.    Plaintiff LM General Insurance Company did in fact reasonably and justifiably rely on the foregoing material misrepresentations, which it was led to believe existed as a result of Defendants' acts of fraud and deception.

257.    Had Plaintiff LM General Insurance Company known of the fraudulent content of, and misrepresentations in, the medical records, reports, treatment verifications, and bills for medical treatment, it would not have paid Crosstown Chiropractic's claims for No-fault insurance benefits submitted in connection therewith.

258.    Furthermore, Defendants' far reaching pattern of fraudulent conduct evinces a high degree of moral turpitude and wanton dishonesty which, as alleged above, has harmed, and will

continue to harm, the public at large, thus entitling Plaintiff LM General Insurance Company to recovery of exemplary and punitive damages.

259.    By reason of the foregoing, Plaintiffs LM General Insurance Company has sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $7,000, the exact amount to be determined at trial, plus interest, costs, punitive damages and other relief the Court deems just.

## SIXTH CLAIM FOR RELIEF

## AGAINST CROSSTOWN CHIROPRACTIC, P.C. AND ROSS FIALKOV, D.C.

### (Unjust Enrichment)

260.    The allegations of paragraphs 1 through 203 are hereby repeated and re-alleged as though fully set forth herein.

261.    By reason of their wrongdoing, Defendants Crosstown Chiropractic and Fialkov have been unjustly enriched, in that they have, directly and/or indirectly, received monies from Plaintiff LM General Insurance Company that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

262.    Plaintiff LM General Insurance Company is therefore entitled to restitution from Defendants Crosstown Chiropractic and Fialkov in the amount by which Defendants have been unjustly enriched.

263.    By reason of the foregoing, one or more Plaintiff LM General Insurance Company has sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $7,000, the exact amount to be determined at trial, plus interest, costs and other relief the Court deems just.

## SEVENTH CLAIM FOR RELIEF

## AGAINST ANTHONY BABITZ, D.C.

## (RICO, pursuant to 18 U.S.C § 1962(c))

264.    The allegations of paragraphs 1 through 203 are hereby repeated and re-alleged as though fully set forth herein.

## THE RICO ENTERPRISE

265.    At all relevant times mentioned herein, Dynamic Healthcare Center, LLC was an "enterprise" engaged in, or the activities of which affect, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

266.    From in or about 2019 through the date of the filing of this Complaint, Defendant Babitz conducted and participated in the affairs of the Dynamic Healthcare Center, LLC enterprise through a pattern of racketeering activity, including the many acts of mail fraud described herein, in the representative list of predicate acts set forth in the Appendix accompanying this Complaint, all of which are incorporated by reference. Defendant's conduct constitutes a violation of 18 U.S.C. § 1962(c).

267.    At all relevant times mentioned herein, Babitz participated in the affairs of the Dynamic Healthcare Center, LLC enterprise through a pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted fraudulent bills and supporting documents to Plaintiffs Liberty Mutual Fire Insurance Company, LM Insurance Corporation, and LM General Insurance Company that were based, in part, on pf-NCS Testing that was not rendered as billed, fabricated, medically unnecessary and/or of no diagnostic value.

## THE PATTERN OF RACKETEERING ACTIVITY

### (Racketeering Acts)

268.    The racketeering acts set forth herein were carried out on a continued basis over more than a 1 year period, were related and similar, and were committed as part of Babitz's ongoing scheme to fraudulently bill for pf-NCS Testing to defraud insurers and, if not stopped, will continue into the future.

269.    On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, inasmuch as Dynamic Healthcare Center, LLC continues to pursue collection on the fraudulent billing to the present day.

270.    As a part of the pattern of racketeering activity, and for the purpose of executing the scheme and artifice to defraud as described above, Babitz caused mailings to be made through the United States Postal Service, in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Liberty Mutual Fire Insurance Company, LM Insurance Corporation, and LM General Insurance Company, and to induce them to issue checks to the Dynamic Healthcare Center, LLC enterprise based upon materially false and misleading information.

271.    Through the Dynamic Healthcare Center, LLC enterprise, Babitz submitted fraudulent claim forms seeking payment for pf-NCS Testing that was not performed as billed and/or fabricated and/or of no diagnostic value. The bills and supporting documents that were sent by and/or on behalf of Babitz and/or others acting under his direction and control, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service. By virtue of those activities, Babitz engaged in a continuous series of predicate acts of

mail fraud, extending from the formation of the Dynamic Healthcare Center, LLC enterprise through the filing of this Complaint.

272.    A representative sample of predicate acts, set forth in the accompanying Appendix, identifies the nature and date of mailings that were made by or on behalf of Babitz in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

273.    Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(b).

274.    Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

### Damages

275.    By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Liberty Mutual Fire Insurance Company, LM Insurance Corporation, and LM General Insurance Company have been injured in their business and property and been damaged in the aggregate amount presently in excess of $20,000, the exact amount to be determined at trial.

276.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs Liberty Mutual Fire Insurance Company, LM Insurance Corporation, and LM General Insurance Company are entitled to recover from Anthony Babitz, three-fold damages sustained by them, together with the costs of this lawsuit and reasonable attorneys' fees.

### EIGHTH CLAIM FOR RELIEF

### AGAINST DYNAMIC HEALTHCARE CENTER, LLC AND ANTHONY BABITZ, D.C.

### (Common Law Fraud)

277.    The allegations of paragraphs 1 through 203 are hereby repeated and re-alleged as though fully set forth herein.

278.    Defendants Dynamic Healthcare Center and Babitz intentionally, knowingly, fraudulently, and with an intent to deceive Plaintiffs Liberty Mutual Fire Insurance Company, Liberty Insurance Corporation, LM Insurance Corporation, and LM General Insurance Company, made numerous false and misleading statements of material fact as to the necessity of the medical services purportedly rendered and that the medical services were provided when, in fact, they were not, thereby inducing Plaintiffs Liberty Mutual Fire Insurance Company, Liberty Insurance Corporation, LM Insurance Corporation, and LM General Insurance Company to make payments to Defendants that Defendants were not entitled to because of their fraudulent nature. As part of the fraudulent scheme implemented by Babitz, Dynamic Healthcare Center made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiffs Liberty Mutual Fire Insurance Company, Liberty Insurance Corporation, LM Insurance Corporation, and LM General Insurance Company for payment.

279.    Defendants Dynamic Healthcare Center and Babitz intentionally, knowingly, fraudulently, and with the intent to commit and facilitate billing fraud and deceive Plaintiffs Liberty Mutual Fire Insurance Company, Liberty Insurance Corporation, LM Insurance Corporation, and LM General Insurance Company, concealed the fact that the bills submitted to them for reimbursement of No-fault benefits for services relating to the performance of pf-NCS Testing were misrepresented.

280.    Defendants Dynamic Healthcare Center and Babitz intentionally, knowingly, fraudulently, and with the intent to commit and facilitate billing fraud and deceive Plaintiffs Liberty Mutual Fire Insurance Company, Liberty Insurance Corporation, LM Insurance Corporation, and LM General Insurance Company, concealed the fact that, in many instances, the services relating to pf-NCS Testing were of no diagnostic value.

281.     Defendants Dynamic Healthcare Center and Babitz intentionally, knowingly, fraudulently, and with the intent to commit and facilitate billing fraud and deceive Plaintiffs Liberty Mutual Fire Insurance Company, Liberty Insurance Corporation, LM Insurance Corporation, and LM General Insurance Company, concealed the fact that the services, if provided at all, were provided pursuant to a protocol that was intended to maximize Defendants' profit and reimbursement of payments from Plaintiffs Liberty Mutual Fire Insurance Company, Liberty Insurance Corporation, LM Insurance Corporation, and LM General Insurance Company, as opposed to medical necessity.

282.     On information and belief, Defendants intentionally, knowingly, fraudulently, and with the intent to deceive, submitted patient medical records, reports, treatment verifications and bills for medical treatment which contained false representations of material facts, including but not limited to the following fraudulent material misrepresentations:

- False and misleading statements contained in medical reports that Defendants selectively detected the activation of a Covered Person's nerve's A-Delta fibers, when in fact they did not.

- False and misleading statements contained in bills for pf-NCS Testing submitted to Plaintiffs that the Defendants performed Nerve Conduction Studies on Covered Persons which were reimbursable pursuant to CPT Code 95904, when in fact they did not.

- False and misleading statements and information designed to conceal the fact that the treatment and pf-NCS Testing provided for a Covered Person's purported injury were not rendered as billed, fabricated, medically unnecessary and/or of no diagnostic value.

- False and misleading statements exaggerating and/or falsifying the clinical usefulness of pf-NCS Testing for the treatment of the purported injuries suffered by Covered Persons.

- False and misleading statements concealing the fact that the pf-NCS Testing was rendered to Covered Persons pursuant to a fraudulent protocol and predetermined course of treatment intended to maximize Defendant's profit and reimbursement of payments.

- False and misleading test results, reports and bills that sought reimbursement for pf-NCS Testing when, in fact, in many instances, such services were not rendered as billed; and

- Other misrepresentations, including but not limited to those contained in paragraphs 1 through 203 above.

283. On information and belief, in numerous instances, the medical records, reports and bills submitted by Defendants to Plaintiffs Liberty Mutual Fire Insurance Company, Liberty Insurance Corporation, LM Insurance Corporation, and LM General Insurance Company in connection with pf-NCS Testing set forth fictional findings, diagnoses and representations of the services provided. The false representations contained therein not only were intended to defraud Plaintiffs Liberty Mutual Fire Insurance Company, Liberty Insurance Corporation, LM Insurance Corporation, and LM General Insurance Company, but constitute a grave and serious danger to the Covered Persons and the consumer public, particularly if the sham and fictional diagnoses and test results were to be relied upon by any subsequent healthcare provider.

284. The foregoing was intended to deceive and mislead Plaintiffs Liberty Mutual Fire Insurance Company, Liberty Insurance Corporation, LM Insurance Corporation, and LM General Insurance Company into believing that Babitz, through Dynamic Healthcare Center, was providing medically valid services when, in fact, he was not.

285. Defendants knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiffs Liberty Mutual Fire Insurance Company, Liberty Insurance Corporation, LM Insurance Corporation, and LM General Insurance Company to rely thereon.

286. Plaintiffs Liberty Mutual Fire Insurance Company, Liberty Insurance Corporation, LM Insurance Corporation, and LM General Insurance Company did in fact reasonably and

justifiably rely on the foregoing material misrepresentations, which they were led to believe existed as a result of Defendants' acts of fraud and deception.

287.    Had Plaintiffs Liberty Mutual Fire Insurance Company, Liberty Insurance Corporation, LM Insurance Corporation, and LM General Insurance Company known of the fraudulent content of, and misrepresentations in, the medical records, reports, treatment verifications, and bills for medical treatment, they would not have paid Crosstown Chiropractic's claims for No-fault insurance benefits submitted in connection therewith.

288.    Furthermore, Defendants' far reaching pattern of fraudulent conduct evinces a high degree of moral turpitude and wanton dishonesty which, as alleged above, has harmed, and will continue to harm, the public at large, thus entitling Plaintiffs Liberty Mutual Fire Insurance Company, Liberty Insurance Corporation, LM Insurance Corporation, and LM General Insurance Company to recovery of exemplary and punitive damages.

289.    By reason of the foregoing, Plaintiffs Liberty Mutual Fire Insurance Company, Liberty Insurance Corporation, LM Insurance Corporation, and LM General Insurance Company have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $20,000, the exact amount to be determined at trial, plus interest, costs, punitive damages and other relief the Court deems just.

### NINTH CLAIM FOR RELIEF

### AGAINST DYNAMIC HEALTHCARE CENTER, LLC AND ANTHONY BABITZ, D.C.

### (Unjust Enrichment)

290.    The allegations of paragraphs 1 through 203 are hereby repeated and re-alleged as though fully set forth herein.

291.    By reason of their wrongdoing, Defendants Dynamic Healthcare Center and Babitz have been unjustly enriched, in that they have, directly and/or indirectly, received monies from Plaintiffs Liberty Mutual Fire Insurance Company, Liberty Insurance Corporation, LM Insurance Corporation, and LM General Insurance Company that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

292.    Plaintiffs Liberty Mutual Fire Insurance Company, Liberty Insurance Corporation, LM Insurance Corporation, and LM General Insurance Company are therefore entitled to restitution from Defendants Dynamic Healthcare Center and Babitz in the amount by which Defendants have been unjustly enriched.

293.    By reason of the foregoing, one or more Plaintiffs have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $20,000, the exact amount to be determined at trial, plus interest, costs and other relief the Court deems just.

## TENTH CLAIM FOR RELIEF

## <u>AGAINST MELANIE WALCOTT, D.C.</u>

### (RICO, pursuant to 18 U.S.C § 1962(c))

294.    The allegations of paragraphs 1 through 203 are hereby repeated and re-alleged as though fully set forth herein.

## <u>THE RICO ENTERPRISE</u>

295.    At all relevant times mentioned herein, JC Chiropractic, PLLC was an "enterprise" engaged in, or the activities of which affect, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

296.     From in or about 2014 through the date of the filing of this Complaint, Defendant Walcott conducted and participated in the affairs of the JC Chiropractic, PLLC enterprise through a pattern of racketeering activity, including the many acts of mail fraud described herein, in the representative list of predicate acts set forth in the Appendix accompanying this Complaint, all of which are incorporated by reference. Defendant's conduct constitutes a violation of 18 U.S.C. § 1962(c).

297.     At all relevant times mentioned herein, Walcott participated in the affairs of the JC Chiropractic, PLLC enterprise through a pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted fraudulent bills and supporting documents to Plaintiffs Liberty Mutual Fire Insurance Company, American States Insurance Company, The First Liberty Insurance Corporation, LM Insurance Corporation, and LM General Insurance Company that were based, in part, on pf-NCS Testing that was not rendered as billed, fabricated, medically unnecessary and/or of no diagnostic value.

## THE PATTERN OF RACKETEERING ACTIVITY

### (Racketeering Acts)

298.     The racketeering acts set forth herein were carried out on a continued basis over more than a 6 year period, were related and similar, and were committed as part of Walcott's ongoing scheme to fraudulently bill for pf-NCS Testing to defraud insurers and, if not stopped, will continue into the future.

299.     On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, inasmuch as JC Chiropractic, PLLC continues to pursue collection on the fraudulent billing to the present day.

300.     As a part of the pattern of racketeering activity, and for the purpose of executing the scheme and artifice to defraud as described above, Walcott caused mailings to be made through the United States Postal Service, in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Liberty Mutual Fire Insurance Company, American States Insurance Company, The First Liberty Insurance Corporation, LM Insurance Corporation, LM General Insurance Company, and to induce them to issue checks to the JC Chiropractic, PLLC enterprise based upon materially false and misleading information.

301.     Through the JC Chiropractic, PLLC enterprise, Walcott submitted fraudulent claim forms seeking payment for pf-NCS Testing that was not performed as billed and/or fabricated and/or of no diagnostic value. The bills and supporting documents that were sent by and/or on behalf of Walcott and/or others acting under his direction and control, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service. By virtue of those activities, Walcott engaged in a continuous series of predicate acts of mail fraud, extending from the formation of the JC Chiropractic, PLLC enterprise through the filing of this Complaint.

302.     A representative sample of predicate acts, set forth in the accompanying Appendix, identifies the nature and date of mailings that were made by or on behalf of Walcott in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

303.     Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(b).

304.     Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

**Damages**

305.     By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Liberty Mutual Fire Insurance Company, American States Insurance Company, The First Liberty Insurance Corporation, LM Insurance Corporation, and LM General Insurance Company have been injured in their business and property and been damaged in the aggregate amount presently in excess of $44,000, the exact amount to be determined at trial.

306.     Pursuant to 18 U.S.C. § 1964(c), Plaintiffs Liberty Mutual Fire Insurance Company, American States Insurance Company, The First Liberty Insurance Corporation, LM Insurance Corporation, and LM General Insurance Company are entitled to recover from Melanie Walcott, three-fold damages sustained by them, together with the costs of this lawsuit and reasonable attorneys' fees.

### ELEVENTH CLAIM FOR RELIEF

### AGAINST JC CHIROPRACTIC, PLLC AND MELANIE WALCOTT, D.C.

### (Common Law Fraud)

307.     The allegations of paragraphs 1 through 203 are hereby repeated and re-alleged as though fully set forth herein.

308.     Defendants JC Chiropractic and Walcott intentionally, knowingly, fraudulently, and with an intent to deceive Plaintiffs Liberty Mutual Fire Insurance Company, American States Insurance Company, The First Liberty Insurance Corporation, LM Insurance Corporation, and LM General Insurance Company, made numerous false and misleading statements of material fact as to the necessity of the medical services purportedly rendered and that the medical services were provided when, in fact, they were not, thereby inducing Plaintiffs Liberty Mutual Fire Insurance Company, American States Insurance Company, The First Liberty Insurance Corporation, LM Insurance Corporation, and LM General Insurance Company to make payments to Defendants that

Defendants were not entitled to because of their fraudulent nature. As part of the fraudulent scheme implemented by Walcott, JC Chiropractic made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiffs Liberty Mutual Fire Insurance Company, American States Insurance Company, The First Liberty Insurance Corporation, LM Insurance Corporation, and LM General Insurance Company for payment.

309.    Defendants JC Chiropractic and Walcott intentionally, knowingly, fraudulently, and with the intent to commit and facilitate billing fraud and deceive Plaintiffs Liberty Mutual Fire Insurance Company, American States Insurance Company, The First Liberty Insurance Corporation, LM Insurance Corporation, and LM General Insurance Company, concealed the fact that the bills submitted to them for reimbursement of No-fault benefits for services relating to the performance of pf-NCS Testing were misrepresented.

310.    Defendants JC Chiropractic and Walcott intentionally, knowingly, fraudulently, and with the intent to commit and facilitate billing fraud and deceive Plaintiffs Liberty Mutual Fire Insurance Company, The First Liberty Insurance Corporation, American States Insurance Company, LM Insurance Corporation, and LM General Insurance Company, concealed the fact that, in many instances, the services relating to pf-NCS Testing were of no diagnostic value.

311.    Defendants JC Chiropractic and Walcott intentionally, knowingly, fraudulently, and with the intent to commit and facilitate billing fraud and deceive Plaintiffs Liberty Mutual Fire Insurance Company, American States Insurance Company, The First Liberty Insurance Corporation, LM Insurance Corporation, and LM General Insurance Company, concealed the fact that the services, if provided at all, were provided pursuant to a protocol that was intended to maximize Defendants' profit and reimbursement of payments from Plaintiffs Liberty Mutual Fire Insurance Company, American States Insurance Company, The First Liberty Insurance

Corporation, LM Insurance Corporation, and LM General Insurance Company, as opposed to medical necessity.

312.    On information and belief, Defendants intentionally, knowingly, fraudulently, and with the intent to deceive, submitted patient medical records, reports, treatment verifications and bills for medical treatment which contained false representations of material facts, including but not limited to the following fraudulent material misrepresentations:

- False and misleading statements contained in medical reports that Defendants selectively detected the activation of a Covered Person's nerve's A-Delta fibers, when in fact they did not.

- False and misleading statements contained in bills for pf-NCS Testing submitted to Plaintiffs that the Defendants performed Nerve Conduction Studies on Covered Persons which were reimbursable pursuant to CPT Code 95904, when in fact they did not.

- False and misleading statements and information designed to conceal the fact that the treatment and pf-NCS Testing provided for a Covered Person's purported injury were not rendered as billed, fabricated, medically unnecessary and/or of no diagnostic value.

- False and misleading statements exaggerating and/or falsifying the clinical usefulness of pf-NCS Testing for the treatment of the purported injuries suffered by Covered Persons.

- False and misleading statements concealing the fact that the pf-NCS Testing was rendered to Covered Persons pursuant to a fraudulent protocol and predetermined course of treatment intended to maximize Defendant's profit and reimbursement of payments.

- False and misleading test results, reports and bills that sought reimbursement for pf-NCS Testing when, in fact, in many instances, such services were not rendered as billed; and

- Other misrepresentations, including but not limited to those contained in paragraphs 1 through 203 above.

313.    On information and belief, in numerous instances, the medical records, reports and bills submitted by Defendants to Plaintiffs Liberty Mutual Fire Insurance Company, American States Insurance Company, The First Liberty Insurance Corporation, LM Insurance Corporation,

and LM General Insurance Company in connection with pf-NCS Testing set forth fictional findings, diagnoses and representations of the services provided. The false representations contained therein not only were intended to defraud Plaintiffs Liberty Mutual Fire Insurance Company, American States Insurance Company, The First Liberty Insurance Corporation, LM Insurance Corporation, and LM General Insurance Company, but constitute a grave and serious danger to the Covered Persons and the consumer public, particularly if the sham and fictional diagnoses and test results were to be relied upon by any subsequent healthcare provider.

314.    The foregoing was intended to deceive and mislead Plaintiffs Liberty Mutual Fire Insurance Company, American States Insurance Company, The First Liberty Insurance Corporation, LM Insurance Corporation, and LM General Insurance Company into believing that Walcott, through JC Chiropractic was providing medically valid services when, in fact, he was not.

315.    Defendants knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiffs Liberty Mutual Fire Insurance Company, American States Insurance Company, The First Liberty Insurance Corporation, LM Insurance Corporation, and LM General Insurance Company to rely thereon.

316.    Plaintiffs Liberty Mutual Fire Insurance Company, American States Insurance Company, The First Liberty Insurance Corporation, LM Insurance Corporation, and LM General Insurance Company did in fact reasonably and justifiably rely on the foregoing material misrepresentations, which they were led to believe existed as a result of Defendants' acts of fraud and deception.

317.    Had Plaintiffs Liberty Mutual Fire Insurance Company, American States Insurance Company, The First Liberty Insurance Corporation, LM Insurance Corporation, and LM General

Insurance Company known of the fraudulent content of, and misrepresentations in, the medical records, reports, treatment verifications, and bills for medical treatment, they would not have paid JC Chiropractic's claims for No-fault insurance benefits submitted in connection therewith.

318.    Furthermore, Defendants' far reaching pattern of fraudulent conduct evinces a high degree of moral turpitude and wanton dishonesty which, as alleged above, has harmed, and will continue to harm, the public at large, thus entitling Plaintiffs Liberty Mutual Fire Insurance Company, American States Insurance Company, The First Liberty Insurance Corporation, LM Insurance Corporation, and LM General Insurance Company to recovery of exemplary and punitive damages.

319.    By reason of the foregoing, Plaintiffs Liberty Mutual Fire Insurance Company, American States Insurance Company, The First Liberty Insurance Corporation, LM Insurance Corporation, and LM General Insurance Company have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $44,000, the exact amount to be determined at trial, plus interest, costs, punitive damages and other relief the Court deems just.

### TWELFTH CLAIM FOR RELIEF

### AGAINST JC CHIROPRACTIC, PLLC AND MELANIE WALCOTT, D.C.

### (Unjust Enrichment)

320.    The allegations of paragraphs 1 through 203 are hereby repeated and re-alleged as though fully set forth herein.

321.    By reason of their wrongdoing, Defendants JC Chiropractic and Walcott have been unjustly enriched, in that they have, directly and/or indirectly, received monies from Plaintiffs Liberty Mutual Fire Insurance Company, American States Insurance Company, The First Liberty

Insurance Corporation, LM Insurance Corporation, and LM General Insurance Company that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

322.    Plaintiffs Liberty Mutual Fire Insurance Company, American States Insurance Company, The First Liberty Insurance Corporation, LM Insurance Corporation, and LM General Insurance Company are therefore entitled to restitution from Defendants JC Chiropractic and Walcott in the amount by which Defendants have been unjustly enriched.

323.    By reason of the foregoing, one or more Plaintiffs have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $443,000, the exact amount to be determined at trial, plus interest, costs and other relief the Court deems just.

**THIRTEENTH CLAIM FOR RELIEF**

**AGAINST ANTHONY BABITZ, D.C.**

**(RICO, pursuant to 18 U.S.C § 1962(c))**

324.    The allegations of paragraphs 1 through 203 are hereby repeated and re-alleged as though fully set forth herein.

**THE RICO ENTERPRISE**

325.    At all relevant times mentioned herein, Modern Chiropractic Solutions, LLC  was an "enterprise" engaged in, or the activities of which affect, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

326.    From in or about 2015 through the date of the filing of this Complaint, Defendant Babitz conducted and participated in the affairs of the Modern Chiropractic Solutions, LLC enterprise through a pattern of racketeering activity, including the many acts of mail fraud

described herein, in the representative list of predicate acts set forth in the Appendix accompanying this Complaint, all of which are incorporated by reference. Defendant's conduct constitutes a violation of 18 U.S.C. § 1962(c).

327.    At all relevant times mentioned herein, Babitz participated in the affairs of the Modern Chiropractic Solutions, LLC enterprise through a pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted fraudulent bills and supporting documents to Plaintiffs Liberty Mutual Fire Insurance Company and LM General Insurance Company that were based, in part, on pf-NCS Testing that was not rendered as billed, fabricated, medically unnecessary and/or of no diagnostic value.

## THE PATTERN OF RACKETEERING ACTIVITY

### (Racketeering Acts)

328.    The racketeering acts set forth herein were carried out on a continued basis over more than a 5 year period, were related and similar, and were committed as part of Anthony Babitz, D.C.'s ongoing scheme to fraudulently bill for pf-NCS Testing to defraud insurers and, if not stopped, will continue into the future.

329.    On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, inasmuch as Modern Chiropractic Solutions, LLC continues to pursue collection on the fraudulent billing to the present day.

330.    As a part of the pattern of racketeering activity, and for the purpose of executing the scheme and artifice to defraud as described above, Babitz caused mailings to be made through the United States Postal Service, in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Liberty Mutual Fire Insurance Company and LM

General Insurance Company, and to induce them to issue checks to the Modern Chiropractic Solutions, LLC enterprise based upon materially false and misleading information.

331.    Through the Modern Chiropractic Solutions, LLC enterprise, Babitz submitted fraudulent claim forms seeking payment for pf-NCS Testing that was not performed as billed and/or fabricated and/or of no diagnostic value. The bills and supporting documents that were sent by and/or on behalf of Babitz and/or others acting under his direction and control, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service. By virtue of those activities, Babitz engaged in a continuous series of predicate acts of mail fraud, extending from the formation of the Modern Chiropractic Solutions, LLC enterprise through the filing of this Complaint.

332.    A representative sample of predicate acts, set forth in the accompanying Appendix, identifies the nature and date of mailings that were made by or on behalf of Babitz in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

333.    Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(b).

334.    Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

**Damages**

335.    By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Liberty Mutual Fire Insurance Company and LM General Insurance Company have been injured in their business and property and been damaged in the aggregate amount presently in excess of $11,000, the exact amount to be determined at trial.

336.     Pursuant to 18 U.S.C. § 1964(c), Plaintiffs Liberty Mutual Fire Insurance Company and LM General Insurance Company are entitled to recover from Babitz, three-fold damages sustained by them, together with the costs of this lawsuit and reasonable attorneys' fees.

## FOURTEENTH CLAIM FOR RELIEF

## AGAINST MODERN CHIROPRACTIC SOLUTIONS, LLC AND ANTHONY BABITZ, D.C.

### (Common Law Fraud)

337.     The allegations of paragraphs 1 through 203 are hereby repeated and re-alleged as though fully set forth herein.

338.     Defendants Modern Chiropractic Solutions and Babitz intentionally, knowingly, fraudulently, and with an intent to deceive Plaintiffs Liberty Mutual Fire Insurance Company, The First Liberty Insurance Corporation, LM Insurance Corporation, and LM General Insurance Company, made numerous false and misleading statements of material fact as to the necessity of the medical services purportedly rendered and that the medical services were provided when, in fact, they were not, thereby inducing Plaintiffs Liberty Mutual Fire Insurance Company, The First Liberty Insurance Corporation, LM Insurance Corporation, and LM General Insurance Company to make payments to Defendants that Defendants were not entitled to because of their fraudulent nature. As part of the fraudulent scheme implemented by Babitz, Modern Chiropractic Solutions made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiffs Liberty Mutual Fire Insurance Company, The First Liberty Insurance Corporation, LM Insurance Corporation, and LM General Insurance Company for payment.

339.     Defendants Modern Chiropractic Solutions and Babitz intentionally, knowingly, fraudulently, and with the intent to commit and facilitate billing fraud and deceive Plaintiffs Liberty Mutual Fire Insurance Company, The First Liberty Insurance Corporation, LM Insurance

Corporation, and LM General Insurance Company, concealed the fact that the bills submitted to them for reimbursement of No-fault benefits for services relating to the performance of pf-NCS Testing were misrepresented.

340.   Defendants Modern Chiropractic Solutions and Babitz intentionally, knowingly, fraudulently, and with the intent to commit and facilitate billing fraud and deceive Plaintiffs Liberty Mutual Fire Insurance Company, The First Liberty Insurance Corporation, LM Insurance Corporation, and LM General Insurance Company, concealed the fact that, in many instances, the services relating to pf-NCS Testing were of no diagnostic value.

341.   Defendants Modern Chiropractic Solutions and Babitz intentionally, knowingly, fraudulently, and with the intent to commit and facilitate billing fraud and deceive Plaintiffs Liberty Mutual Fire Insurance Company, The First Liberty Insurance Corporation, LM Insurance Corporation, and LM General Insurance Company, concealed the fact that the services, if provided at all, were provided pursuant to a protocol that was intended to maximize Defendants' profit and reimbursement of payments from Plaintiffs Liberty Mutual Fire Insurance Company, The First Liberty Insurance Corporation, LM Insurance Corporation, and LM General Insurance Company, as opposed to medical necessity.

342.   On information and belief, Defendants intentionally, knowingly, fraudulently, and with the intent to deceive, submitted patient medical records, reports, treatment verifications and bills for medical treatment which contained false representations of material facts, including but not limited to the following fraudulent material misrepresentations:

- False and misleading statements contained in medical reports that Defendants selectively detected the activation of a Covered Person's nerve's A-Delta fibers, when in fact they did not.

- False and misleading statements contained in bills for pf-NCS Testing submitted to Plaintiffs that the Defendants performed Nerve

Conduction Studies on Covered Persons which were reimbursable pursuant to CPT Code 95904 and/or 95999, when in fact they did not.

- False and misleading statements and information designed to conceal the fact that the treatment and pf-NCS Testing provided for a Covered Person's purported injury were not rendered as billed, fabricated, medically unnecessary and/or of no diagnostic value.

- False and misleading statements exaggerating and/or falsifying the clinical usefulness of pf-NCS Testing for the treatment of the purported injuries suffered by Covered Persons.

- False and misleading statements concealing the fact that the pf-NCS Testing was rendered to Covered Persons pursuant to a fraudulent protocol and predetermined course of treatment intended to maximize Defendant's profit and reimbursement of payments.

- False and misleading test results, reports and bills that sought reimbursement for pf-NCS Testing when, in fact, in many instances, such services were not rendered as billed; and

- Other misrepresentations, including but not limited to those contained in paragraphs 1 through 203 above.

343.    On information and belief, in numerous instances, the medical records, reports and bills submitted by Defendants to Plaintiffs Liberty Mutual Fire Insurance Company, The First Liberty Insurance Corporation, LM Insurance Corporation, and LM General Insurance Company in connection with pf-NCS Testing set forth fictional findings, diagnoses and representations of the services provided. The false representations contained therein not only were intended to defraud Plaintiffs Liberty Mutual Fire Insurance Company, The First Liberty Insurance Corporation, LM Insurance Corporation, and LM General Insurance Company, but constitute a grave and serious danger to the Covered Persons and the consumer public, particularly if the sham and fictional diagnoses and test results were to be relied upon by any subsequent healthcare provider.

344.    The foregoing was intended to deceive and mislead Plaintiffs Liberty Mutual Fire
Insurance Company, The First Liberty Insurance Corporation, LM Insurance Corporation, and LM
General Insurance Company into believing that Babitz, through Modern Chiropractic Solutions
was providing medically valid services when, in fact, he was not.

345.    Defendants knew the foregoing material misrepresentations to be false when made
and nevertheless made these false representations with the intention and purpose of inducing
Plaintiffs Liberty Mutual Fire Insurance Company, The First Liberty Insurance Corporation, LM
Insurance Corporation, and LM General Insurance Company to rely thereon.

346.    Plaintiffs Liberty Mutual Fire Insurance Company, The First Liberty Insurance
Corporation, LM Insurance Corporation, and LM General Insurance Company did in fact
reasonably and justifiably rely on the foregoing material misrepresentations, which they were led
to believe existed as a result of Defendants' acts of fraud and deception.

347.    Had Plaintiffs Liberty Mutual Fire Insurance Company, The First Liberty Insurance
Corporation, LM Insurance Corporation, and LM General Insurance Company known of the
fraudulent content of, and misrepresentations in, the medical records, reports, treatment
verifications, and bills for medical treatment, they would not have paid Modern Chiropractic
Solutions' claims for No-fault insurance benefits submitted in connection therewith.

348.    Furthermore, Defendants' far reaching pattern of fraudulent conduct evinces a high
degree of moral turpitude and wanton dishonesty which, as alleged above, has harmed, and will
continue to harm, the public at large, thus entitling Plaintiffs Liberty Mutual Fire Insurance
Company, The First Liberty Insurance Corporation, LM Insurance Corporation, and LM General
Insurance Company to recovery of exemplary and punitive damages.

349.     By reason of the foregoing, Plaintiffs Liberty Mutual Fire Insurance Company, The First Liberty Insurance Corporation, LM Insurance Corporation, and LM General Insurance Company have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $13,000, the exact amount to be determined at trial, plus interest, costs, punitive damages and other relief the Court deems just.

### FIFTEENTH CLAIM FOR RELIEF

### AGAINST MODERN CHIROPRACTIC SOLUTIONS, LLC AND ANTHONY BABITZ, D.C.

#### (Unjust Enrichment)

350.     The allegations of paragraphs 1 through 203 are hereby repeated and re-alleged as though fully set forth herein.

351.     By reason of their wrongdoing, Defendants Modern Chiropractic Solutions and Babitz have been unjustly enriched, in that they have, directly and/or indirectly, received monies from Plaintiffs Liberty Mutual Fire Insurance Company, The First Liberty Insurance Corporation, LM Insurance Corporation, and LM General Insurance Company that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

352.     Plaintiffs Liberty Mutual Fire Insurance Company, The First Liberty Insurance Corporation, LM Insurance Corporation, and LM General Insurance Company are therefore entitled to restitution from Defendants Modern Chiropractic Solutions and Babitz in the amount by which Defendants have been unjustly enriched.

353.     By reason of the foregoing, one or more Plaintiffs have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $13,000, the exact amount to be determined at trial, plus interest, costs and other relief the Court deems just.

## SIXTEENTH CLAIM FOR RELIEF

## AGAINST MARK SOFFER, D.C.

### (RICO, pursuant to 18 U.S.C § 1962(c))

354.   The allegations of paragraphs 1 through 203 are hereby repeated and re-alleged as though fully set forth herein.

### THE RICO ENTERPRISE

355.   At all relevant times mentioned herein, Nassau Chiropractic Services, PC  was an "enterprise" engaged in, or the activities of which affect, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

356.   From in or about 2014 through the date of the filing of this Complaint, Defendant Soffer conducted and participated in the affairs of the Nassau Chiropractic Services, PC enterprise through a pattern of racketeering activity, including the many acts of mail fraud described herein, in the representative list of predicate acts set forth in the Appendix accompanying this Complaint, all of which are incorporated by reference. Defendant's conduct constitutes a violation of 18 U.S.C. § 1962(c).

357.   At all relevant times mentioned herein, Soffer participated in the affairs of the Nassau Chiropractic Services, PC enterprise through a pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted fraudulent bills and supporting documents to Plaintiffs Liberty Mutual Fire Insurance Company, American States Insurance Company, The First Liberty Insurance Corporation, LM General Insurance Company, and LM Insurance Corporation that were based, in part, on pf-NCS Testing that was not rendered as billed, fabricated, medically unnecessary and/or of no diagnostic value.

## THE PATTERN OF RACKETEERING ACTIVITY

### (Racketeering Acts)

358.    The racketeering acts set forth herein were carried out on a continued basis over more than a 6 year period, were related and similar, and were committed as part of Soffer's ongoing scheme to fraudulently bill for pf-NCS Testing to defraud insurers and, if not stopped, will continue into the future.

359.    On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, inasmuch as Nassau Chiropractic Services, PC continues to pursue collection on the fraudulent billing to the present day.

360.    As a part of the pattern of racketeering activity, and for the purpose of executing the scheme and artifice to defraud as described above, Soffer caused mailings to be made through the United States Postal Service, in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Liberty Mutual Fire Insurance Company, American States Insurance Company, The First Liberty Insurance Corporation, LM General Insurance Company, and LM Insurance Corporation, and to induce them to issue checks to the Nassau Chiropractic Services, PC enterprise based upon materially false and misleading information.

361.    Through the Nassau Chiropractic Services, PC enterprise, Soffer submitted fraudulent claim forms seeking payment for pf-NCS Testing that was not performed as billed and/or fabricated and/or of no diagnostic value. The bills and supporting documents that were sent by and/or on behalf of Soffer and/or others acting under his direction and control, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service. By virtue of those activities, Soffer engaged in a continuous series of predicate acts of

mail fraud, extending from the formation of the Nassau Chiropractic Services, PC enterprise through the filing of this Complaint.

362.    A representative sample of predicate acts, set forth in the accompanying Appendix, identifies the nature and date of mailings that were made by or on behalf of Soffer in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

363.    Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(b).

364.    Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

## Damages

365.    By reason of the foregoing violation of 18 U.S.C. § 1962(c), Liberty Mutual Fire Insurance Company, American States Insurance Company, The First Liberty Insurance Corporation, LM General Insurance Company, and LM Insurance Corporation have been injured in their business and property and been damaged in the aggregate amount presently in excess of $81,000 , the exact amount to be determined at trial.

366.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs Liberty Mutual Fire Insurance Company, American States Insurance Company, The First Liberty Insurance Corporation, LM General Insurance Company, and LM Insurance Corporation are entitled to recover from Soffer, three-fold damages sustained by them, together with the costs of this lawsuit and reasonable attorneys' fees.

### SEVENTEENTH CLAIM FOR RELIEF

### AGAINST NASSAU CHIROPRACTIC SERVICES, P.C. AND MARK SOFFER, D.C.

### (Common Law Fraud)

367. The allegations of paragraphs 1 through 203 are hereby repeated and re-alleged as though fully set forth herein.

368. Defendants Nassau Chiropractic Services and Soffer intentionally, knowingly, fraudulently, and with an intent to deceive Plaintiffs Liberty Mutual Fire Insurance Company, American States Insurance Company, The First Liberty Insurance Corporation, Liberty Insurance Corporation, LM General Insurance Company, and LM Insurance Corporation, made numerous false and misleading statements of material fact as to the necessity of the medical services purportedly rendered and that the medical services were provided when, in fact, they were not, thereby inducing Plaintiffs Liberty Mutual Fire Insurance Company, American States Insurance Company, The First Liberty Insurance Corporation, Liberty Insurance Corporation, LM General Insurance Company, and LM Insurance Corporation to make payments to Defendants that Defendants were not entitled to because of their fraudulent nature. As part of the fraudulent scheme implemented by Soffer, Nassau Chiropractic Services made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiffs Liberty Mutual Fire Insurance Company, American States Insurance Company, The First Liberty Insurance Corporation, Liberty Insurance Corporation, LM General Insurance Company, and LM Insurance Corporation for payment.

369. Defendants Nassau Chiropractic Services and Soffer intentionally, knowingly, fraudulently, and with the intent to commit and facilitate billing fraud and deceive Plaintiffs Liberty Mutual Fire Insurance Company, American States Insurance Company, The First Liberty

Insurance Corporation, Liberty Insurance Corporation, LM General Insurance Company, and LM Insurance Corporation, concealed the fact that the bills submitted to them for reimbursement of No-fault benefits for services relating to the performance of pf-NCS Testing were misrepresented.

370.   Defendants Nassau Chiropractic Services and Soffer intentionally, knowingly, fraudulently, and with the intent to commit and facilitate billing fraud and deceive Plaintiffs Liberty Mutual Fire Insurance Company, American States Insurance Company, The First Liberty Insurance Corporation, Liberty Insurance Corporation, LM General Insurance Company, and LM Insurance Corporation, concealed the fact that, in many instances, the services relating to pf-NCS Testing were of no diagnostic value.

371.   Defendants Nassau Chiropractic Services and Soffer intentionally, knowingly, fraudulently, and with the intent to commit and facilitate billing fraud and deceive Plaintiffs Liberty Mutual Fire Insurance Company, American States Insurance Company, The First Liberty Insurance Corporation, Liberty Insurance Corporation, LM General Insurance Company, and LM Insurance Corporation, concealed the fact that the services, if provided at all, were provided pursuant to a protocol that was intended to maximize Defendants' profit and reimbursement of payments from Plaintiffs Liberty Mutual Fire Insurance Company, American States Insurance Company, The First Liberty Insurance Corporation, Liberty Insurance Corporation, LM General Insurance Company, and LM Insurance Corporation, as opposed to medical necessity.

372.   On information and belief, Defendants intentionally, knowingly, fraudulently, and with the intent to deceive, submitted patient medical records, reports, treatment verifications and bills for medical treatment which contained false representations of material facts, including but not limited to the following fraudulent material misrepresentations:

- False and misleading statements contained in medical reports that Defendants selectively detected the activation of a Covered Person's nerve's A-Delta fibers, when in fact they did not.

- False and misleading statements contained in bills for pf-NCS Testing submitted to Plaintiffs that the Defendants performed Nerve Conduction Studies on Covered Persons which were reimbursable pursuant to CPT Code 95904, when in fact they did not.

- False and misleading statements and information designed to conceal the fact that the treatment and pf-NCS Testing provided for a Covered Person's purported injury were not rendered as billed, fabricated, medically unnecessary and/or of no diagnostic value.

- False and misleading statements exaggerating and/or falsifying the clinical usefulness of pf-NCS Testing for the treatment of the purported injuries suffered by Covered Persons.

- False and misleading statements concealing the fact that the pf-NCS Testing was rendered to Covered Persons pursuant to a fraudulent protocol and predetermined course of treatment intended to maximize Defendant's profit and reimbursement of payments.

- False and misleading test results, reports and bills that sought reimbursement for pf-NCS Testing when, in fact, in many instances, such services were not rendered as billed; and

- Other misrepresentations, including but not limited to those contained in paragraphs 1 through 203 above.

373.    On information and belief, in numerous instances, the medical records, reports and bills submitted by Defendants to Plaintiffs Liberty Mutual Fire Insurance Company, American States Insurance Company, The First Liberty Insurance Corporation, Liberty Insurance Corporation, LM General Insurance Company, and LM Insurance Corporation in connection with pf-NCS Testing set forth fictional findings, diagnoses and representations of the services provided. The false representations contained therein not only were intended to defraud Plaintiffs Liberty Mutual Fire Insurance Company, American States Insurance Company, The First Liberty Insurance Corporation, Liberty Insurance Corporation, LM General Insurance Company, and LM Insurance Corporation, but constitute a grave and serious danger to the Covered Persons and the consumer

public, particularly if the sham and fictional diagnoses and test results were to be relied upon by any subsequent healthcare provider.

374.    The foregoing was intended to deceive and mislead Plaintiffs Liberty Mutual Fire Insurance Company, American States Insurance Company, The First Liberty Insurance Corporation, Liberty Insurance Corporation, LM General Insurance Company, and LM Insurance Corporation into believing that Soffer, through Nassau Chiropractic Services was providing medically valid services when, in fact, he was not.

375.    Defendants knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiffs Liberty Mutual Fire Insurance Company, American States Insurance Company, The First Liberty Insurance Corporation, Liberty Insurance Corporation, LM General Insurance Company, and LM Insurance Corporation to rely thereon.

376.    Plaintiffs Liberty Mutual Fire Insurance Company, American States Insurance Company, The First Liberty Insurance Corporation, Liberty Insurance Corporation, LM General Insurance Company, and LM Insurance Corporation did in fact reasonably and justifiably rely on the foregoing material misrepresentations, which they were led to believe existed as a result of Defendants' acts of fraud and deception.

377.    Had Plaintiffs Liberty Mutual Fire Insurance Company, American States Insurance Company, The First Liberty Insurance Corporation, Liberty Insurance Corporation, LM General Insurance Company, and LM Insurance Corporation known of the fraudulent content of, and misrepresentations in, the medical records, reports, treatment verifications, and bills for medical treatment, they would not have paid Nassau Chiropractic Services' claims for No-fault insurance benefits submitted in connection therewith.

378.     Furthermore, Defendants' far reaching pattern of fraudulent conduct evinces a high degree of moral turpitude and wanton dishonesty which, as alleged above, has harmed, and will continue to harm, the public at large, thus entitling Plaintiffs Liberty Mutual Fire Insurance Company, American States Insurance Company, The First Liberty Insurance Corporation, Liberty Insurance Corporation, LM General Insurance Company, and LM Insurance Corporation to recovery of exemplary and punitive damages.

379.     By reason of the foregoing, Plaintiffs Liberty Mutual Fire Insurance Company, American States Insurance Company, The First Liberty Insurance Corporation, Liberty Insurance Corporation, LM General Insurance Company, and LM Insurance Corporation have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $81,000, the exact amount to be determined at trial, plus interest, costs, punitive damages and other relief the Court deems just.

## EIGHTEENTH CLAIM FOR RELIEF

### AGAINST NASSAU CHIROPRACTIC SERVICES, P.C. AND MARK SOFFER, D.C.

**(Unjust Enrichment)**

380.     The allegations of paragraphs 1 through 203 are hereby repeated and re-alleged as though fully set forth herein.

381.     By reason of their wrongdoing, Defendants Nassau Chiropractic Services and Soffer have been unjustly enriched, in that they have, directly and/or indirectly, received monies from Plaintiffs Liberty Mutual Fire Insurance Company, American States Insurance Company, The First Liberty Insurance Corporation, Liberty Insurance Corporation, LM General Insurance Company, and LM Insurance Corporation that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

382.    Plaintiffs Liberty Mutual Fire Insurance Company, American States Insurance Company, The First Liberty Insurance Corporation, Liberty Insurance Corporation, LM General Insurance Company, and LM Insurance Corporation are therefore entitled to restitution from Defendants Nassau Chiropractic Services and Soffer in the amount by which Defendants have been unjustly enriched.

383.    By reason of the foregoing, one or more Plaintiffs have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $86,000, the exact amount to be determined at trial, plus interest, costs and other relief the Court deems just.

**NINETEENTH CLAIM FOR RELIEF**

**AGAINST IVAN LAM, D.C.**

**(RICO, pursuant to 18 U.S.C § 1962(c))**

384.    The allegations of paragraphs 1 through 203 are hereby repeated and re-alleged as though fully set forth herein.

**THE RICO ENTERPRISE**

385.    At all relevant times mentioned herein, New York Core Chiropractic, PC  was an "enterprise" engaged in, or the activities of which affect, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

386.    From in or about 2016 through the date of the filing of this Complaint, Defendant Lam conducted and participated in the affairs of the New York Core Chiropractic, PC enterprise through a pattern of racketeering activity, including the many acts of mail fraud described herein, in the representative list of predicate acts set forth in the Appendix accompanying this Complaint,

all of which are incorporated by reference. Defendant's conduct constitutes a violation of 18 U.S.C. § 1962(c).

387.    At all relevant times mentioned herein, Lam participated in the affairs of the New York Core Chiropractic, PC  enterprise through a pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted fraudulent bills and supporting documents to Plaintiffs Liberty Mutual Fire Insurance Company, LM Insurance Corporation, and LM General Insurance Company that were based, in part, on pf-NCS Testing that was not rendered as billed, fabricated, medically unnecessary and/or of no diagnostic value.

## THE PATTERN OF RACKETEERING ACTIVITY

### (Racketeering Acts)

388.    The racketeering acts set forth herein were carried out on a continued basis over more than a 4 year period, were related and similar, and were committed as part of Lam's ongoing scheme to fraudulently bill for pf-NCS Testing to defraud insurers and, if not stopped, will continue into the future.

389.    On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, inasmuch as New York Core Chiropractic, PC continues to pursue collection on the fraudulent billing to the present day.

390.    As a part of the pattern of racketeering activity, and for the purpose of executing the scheme and artifice to defraud as described above, Lam caused mailings to be made through the United States Postal Service, in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Liberty Mutual Fire Insurance Company, LM Insurance Corporation, and LM General Insurance Company, and to induce them to issue checks

to the New York Core Chiropractic, PC enterprise based upon materially false and misleading information.

391.    Through the New York Core Chiropractic, PC enterprise, Lam  submitted fraudulent claim forms seeking payment for pf-NCS Testing that was not performed as billed and/or fabricated and/or of no diagnostic value. The bills and supporting documents that were sent by and/or on behalf of Lam and/or others acting under his direction and control, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service. By virtue of those activities, Lam engaged in a continuous series of predicate acts of mail fraud, extending from the formation of the New York Core Chiropractic, PC enterprise through the filing of this Complaint.

392.    A representative sample of predicate acts, set forth in the accompanying Appendix, identifies the nature and date of mailings that were made by or on behalf of Lam in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

393.    Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(b).

394.    Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

### Damages

395.    By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Liberty Mutual Fire Insurance Company, LM Insurance Corporation, and LM General Insurance Company have been injured in their business and property and been damaged in the aggregate amount presently in excess of $34,000 , the exact amount to be determined at trial.

396.     Pursuant to 18 U.S.C. § 1964(c), Plaintiffs Liberty Mutual Fire Insurance Company, LM Insurance Corporation, and LM General Insurance Company are entitled to recover from Ivan Lam, three-fold damages sustained by them, together with the costs of this lawsuit and reasonable attorneys' fees.

### TWENTIETH CLAIM FOR RELIEF

### <u>AGAINST NEW YORK CORE CHIROPRACTIC, P.C.<br>AND IVAN LAM, D.C.</u>

### (Common Law Fraud)

397.     The allegations of paragraphs 1 through 203 are hereby repeated and re-alleged as though fully set forth herein.

398.     Defendants New York Core Chiropractic and Lam intentionally, knowingly, fraudulently, and with an intent to deceive Plaintiffs Liberty Mutual Fire Insurance Company, American States Insurance Company, Liberty Insurance Corporation, LM Insurance Corporation, and LM General Insurance Company, made numerous false and misleading statements of material fact as to the necessity of the medical services purportedly rendered and that the medical services were provided when, in fact, they were not, thereby inducing Plaintiffs Liberty Mutual Fire Insurance Company, American States Insurance Company, Liberty Insurance Corporation, LM Insurance Corporation, and LM General Insurance Company to make payments to Defendants that Defendants were not entitled to because of their fraudulent nature. As part of the fraudulent scheme implemented by Lam, New York Core Chiropractic made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiffs Liberty Mutual Fire Insurance Company, American States Insurance Company, Liberty Insurance Corporation, LM Insurance Corporation, and LM General Insurance Company for payment.

399.     Defendants New York Core Chiropractic and Lam intentionally, knowingly, fraudulently, and with the intent to commit and facilitate billing fraud and deceive Plaintiffs Liberty Mutual Fire Insurance Company, American States Insurance Company, Liberty Insurance Corporation, LM Insurance Corporation, and LM General Insurance Company, concealed the fact that the bills submitted to them for reimbursement of No-fault benefits for services relating to the performance of pf-NCS Testing were misrepresented.

400.     Defendants New York Core Chiropractic and Lam intentionally, knowingly, fraudulently, and with the intent to commit and facilitate billing fraud and deceive Plaintiffs Liberty Mutual Fire Insurance Company, American States Insurance Company, Liberty Insurance Corporation, LM Insurance Corporation, and LM General Insurance Company, concealed the fact that, in many instances, the services relating to pf-NCS Testing were of no diagnostic value.

401.     Defendants New York Core Chiropractic and Lam intentionally, knowingly, fraudulently, and with the intent to commit and facilitate billing fraud and deceive Plaintiffs Liberty Mutual Fire Insurance Company, American States Insurance Company, Liberty Insurance Corporation, LM Insurance Corporation, and LM General Insurance Company, concealed the fact that the services, if provided at all, were provided pursuant to a protocol that was intended to maximize Defendants' profit and reimbursement of payments from Plaintiffs Liberty Mutual Fire Insurance Company, American States Insurance Company, Liberty Insurance Corporation, LM Insurance Corporation, LM General Insurance Company, as opposed to medical necessity.

402.     On information and belief, Defendants intentionally, knowingly, fraudulently, and with the intent to deceive, submitted patient medical records, reports, treatment verifications and bills for medical treatment which contained false representations of material facts, including but not limited to the following fraudulent material misrepresentations:

- False and misleading statements contained in medical reports that Defendants selectively detected the activation of a Covered Person's nerve's A-Delta fibers, when in fact they did not.

- False and misleading statements contained in bills for pf-NCS Testing submitted to Plaintiffs that the Defendants performed Nerve Conduction Studies on Covered Persons which were reimbursable pursuant to CPT Code 95999, when in fact they did not.

- False and misleading statements and information designed to conceal the fact that the treatment and pf-NCS Testing provided for a Covered Person's purported injury were not rendered as billed, fabricated, medically unnecessary and/or of no diagnostic value.

- False and misleading statements exaggerating and/or falsifying the clinical usefulness of pf-NCS Testing for the treatment of the purported injuries suffered by Covered Persons.

- False and misleading statements concealing the fact that the pf-NCS Testing was rendered to Covered Persons pursuant to a fraudulent protocol and predetermined course of treatment intended to maximize Defendant's profit and reimbursement of payments.

- False and misleading test results, reports and bills that sought reimbursement for pf-NCS Testing when, in fact, in many instances, such services were not rendered as billed; and

- Other misrepresentations, including but not limited to those contained in paragraphs 1 through 203 above.

403.    On information and belief, in numerous instances, the medical records, reports and bills submitted by Defendants to Plaintiffs Liberty Mutual Fire Insurance Company, American States Insurance Company, Liberty Insurance Corporation, LM Insurance Corporation, and LM General Insurance Company in connection with pf-NCS Testing set forth fictional findings, diagnoses and representations of the services provided. The false representations contained therein not only were intended to defraud Plaintiffs Liberty Mutual Fire Insurance Company, American States Insurance Company, Liberty Insurance Corporation, LM Insurance Corporation, and LM General Insurance Company, but constitute a grave and serious danger to the Covered Persons and

the consumer public, particularly if the sham and fictional diagnoses and test results were to be relied upon by any subsequent healthcare provider.

404.    The foregoing was intended to deceive and mislead Plaintiffs Liberty Mutual Fire Insurance Company, American States Insurance Company, Liberty Insurance Corporation, LM Insurance Corporation, and LM General Insurance Company into believing that Lam, through New York Core Chiropractic was providing medically valid services when, in fact, he was not.

405.    Defendants knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiffs Liberty Mutual Fire Insurance Company, American States Insurance Company, Liberty Insurance Corporation, LM Insurance Corporation, and LM General Insurance Company to rely thereon.

406.    Plaintiffs Liberty Mutual Fire Insurance Company, American States Insurance Company, Liberty Insurance Corporation, LM Insurance Corporation ,and LM General Insurance Company did in fact reasonably and justifiably rely on the foregoing material misrepresentations, which they were led to believe existed as a result of Defendants' acts of fraud and deception.

407.    Had Plaintiffs Liberty Mutual Fire Insurance Company, American States Insurance Company, Liberty Insurance Corporation, LM Insurance Corporation, and LM General Insurance Company known of the fraudulent content of, and misrepresentations in, the medical records, reports, treatment verifications, and bills for medical treatment, they would not have paid New York Core Chiropractic's claims for No-fault insurance benefits submitted in connection therewith.

408.    Furthermore, Defendants' far reaching pattern of fraudulent conduct evinces a high degree of moral turpitude and wanton dishonesty which, as alleged above, has harmed, and will continue to harm, the public at large, thus entitling Plaintiffs Liberty Mutual Fire Insurance

Company, American States Insurance Company, Liberty Insurance Corporation, LM Insurance Corporation, and LM General Insurance Company to recovery of exemplary and punitive damages.

409.     By reason of the foregoing, Plaintiffs Liberty Mutual Fire Insurance Company, LM Insurance Corporation, and LM General Insurance Company have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $37,000, the exact amount to be determined at trial, plus interest, costs, punitive damages and other relief the Court deems just.

**TWENTY-FIRST CLAIM FOR RELIEF**

**<u>AGAINST NEW YORK CORE CHIROPRACTIC, P.C.
AND IVAN LAM, D.C.</u>**

**(Unjust Enrichment)**

410.     The allegations of paragraphs 1 through 203 are hereby repeated and re-alleged as though fully set forth herein.

411.     By reason of their wrongdoing, Defendants New York Core Chiropractic and Lam have been unjustly enriched, in that they have, directly and/or indirectly, received monies from Plaintiffs Liberty Mutual Fire Insurance Company, American States Insurance Company, Liberty Insurance Corporation, LM Insurance Corporation, and LM General Insurance Company that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

412.     Plaintiffs Liberty Mutual Fire Insurance Company, American States Insurance Company, Liberty Insurance Corporation, LM Insurance Corporation, and LM General Insurance Company are therefore entitled to restitution from Defendants New York Core Chiropractic and Lam in the amount by which Defendants have been unjustly enriched.

413.     By reason of the foregoing, one or more Plaintiffs have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $37,000, the exact amount to be determined at trial, plus interest, costs and other relief the Court deems just.

## TWENTY-SECOND CLAIM FOR RELIEF

## AGAINST GUY VILLANO, D.C.

## (RICO, pursuant to 18 U.S.C § 1962(c))

414.     The allegations of paragraphs 1 through 203 are hereby repeated and re-alleged as though fully set forth herein.

## THE RICO ENTERPRISE

415.     At all relevant times mentioned herein, Spinal Pro Chiropractic, PC  was an "enterprise" engaged in, or the activities of which affect, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

416.     From in or about 2018 through the date of the filing of this Complaint, Defendant Villano conducted and participated in the affairs of the Spinal Pro Chiropractic, PC enterprise through a pattern of racketeering activity, including the many acts of mail fraud described herein, in the representative list of predicate acts set forth in the Appendix accompanying this Complaint, all of which are incorporated by reference. Defendant's conduct constitutes a violation of 18 U.S.C. § 1962(c).

417.     At all relevant times mentioned herein, Villano participated in the affairs of the Spinal Pro Chiropractic, PC  enterprise through a pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted fraudulent bills and supporting documents

to Plaintiff LM General Insurance Company that were based, in part, on pf-NCS Testing that was not rendered as billed, fabricated, medically unnecessary and/or of no diagnostic value.

## THE PATTERN OF RACKETEERING ACTIVITY

### (Racketeering Acts)

418.    The racketeering acts set forth herein were carried out on a continued basis over more than a 2 year period, were related and similar, and were committed as part of Villano's ongoing scheme to fraudulently bill for pf-NCS Testing to defraud insurers and, if not stopped, will continue into the future.

419.    On information and belief, this pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, inasmuch as Spinal Pro Chiropractic, PC continues to pursue collection on the fraudulent billing to the present day.

420.    As a part of the pattern of racketeering activity, and for the purpose of executing the scheme and artifice to defraud as described above, Villano caused mailings to be made through the United States Postal Service, in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud LM General Insurance Company, and to induce it to issue checks to the Spinal Pro Chiropractic, PC enterprise based upon materially false and misleading information.

421.    Through the Spinal Pro Chiropractic, PC enterprise, Villano submitted fraudulent claim forms seeking payment for pf-NCS Testing that was not performed as billed and/or fabricated and/or of no diagnostic value. The bills and supporting documents that were sent by and/or on behalf of Villano and/or others acting under his direction and control, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service. By virtue of those activities, Villano engaged in a continuous series of predicate acts of

mail fraud, extending from the formation of the Spinal Pro Chiropractic, PC enterprise through the filing of this Complaint.

422.     A representative sample of predicate acts, set forth in the accompanying Appendix, identifies the nature and date of mailings that were made by or on behalf of Villano in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

423.     Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(b).

424.     Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

## Damages

425.     By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiff LM General Insurance Company has been injured in its business and property and been damaged in the aggregate amount presently in excess of $10,000 , the exact amount to be determined at trial.

426.     Pursuant to 18 U.S.C. § 1964(c), Plaintiff LM General Insurance Company are entitled to recover from Villano, three-fold damages sustained by them, together with the costs of this lawsuit and reasonable attorneys' fees.

## TWENTY-THIRD CLAIM FOR RELIEF

## AGAINST SPINAL PRO CHIROPRACTIC, P.C. AND GUY VILLANO, D.C.

## (Common Law Fraud)

427.     The allegations of paragraphs 1 through 203 are hereby repeated and re-alleged as though fully set forth herein.

428.     Defendants Spinal Pro Chiropractic and Villano intentionally, knowingly, fraudulently, and with an intent to deceive Plaintiffs Liberty Mutual Fire Insurance Company and

LM General Insurance Company, made numerous false and misleading statements of material fact as to the necessity of the medical services purportedly rendered and that the medical services were provided when, in fact, they were not, thereby inducing Plaintiffs Liberty Mutual Fire Insurance Company and LM General Insurance Company to make payments to Defendants that Defendants were not entitled to because of their fraudulent nature. As part of the fraudulent scheme implemented by Villano, Spinal Pro Chiropractic made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiffs Liberty Mutual Fire Insurance Company and LM General Insurance Company for payment.

429. Defendants Spinal Pro Chiropractic and Villano intentionally, knowingly, fraudulently, and with the intent to commit and facilitate billing fraud and deceive Plaintiffs Liberty Mutual Fire Insurance Company and LM General Insurance Company, concealed the fact that the bills submitted to them for reimbursement of No-fault benefits for services relating to the performance of pf-NCS Testing were misrepresented.

430. Defendants Spinal Pro Chiropractic and Villano intentionally, knowingly, fraudulently, and with the intent to commit and facilitate billing fraud and deceive Plaintiffs Liberty Mutual Fire Insurance Company and LM General Insurance Company, concealed the fact that, in many instances, the services relating to pf-NCS Testing were of no diagnostic value.

431. Defendants Spinal Pro Chiropractic and Villano intentionally, knowingly, fraudulently, and with the intent to commit and facilitate billing fraud and deceive Plaintiffs Liberty Mutual Fire Insurance Company and LM General Insurance Company, concealed the fact that the services, if provided at all, were provided pursuant to a protocol that was intended to maximize Defendants' profit and reimbursement of payments from Plaintiffs Liberty Mutual Fire Insurance Company and LM General Insurance Company, as opposed to medical necessity.

432.     On information and belief, Defendants intentionally, knowingly, fraudulently, and with the intent to deceive, submitted patient medical records, reports, treatment verifications and bills for medical treatment which contained false representations of material facts, including but not limited to the following fraudulent material misrepresentations:

- False and misleading statements contained in medical reports that Defendants selectively detected the activation of a Covered Person's nerve's A-Delta fibers, when in fact they did not.

- False and misleading statements contained in bills for pf-NCS Testing submitted to Plaintiffs that the Defendants performed Nerve Conduction Studies on Covered Persons which were reimbursable pursuant to CPT Code 95904, when in fact they did not.

- False and misleading statements and information designed to conceal the fact that the treatment and pf-NCS Testing provided for a Covered Person's purported injury were not rendered as billed, fabricated, medically unnecessary and/or of no diagnostic value.

- False and misleading statements exaggerating and/or falsifying the clinical usefulness of pf-NCS Testing for the treatment of the purported injuries suffered by Covered Persons.

- False and misleading statements concealing the fact that the pf-NCS Testing was rendered to Covered Persons pursuant to a fraudulent protocol and predetermined course of treatment intended to maximize Defendant's profit and reimbursement of payments.

- False and misleading test results, reports and bills that sought reimbursement for pf-NCS Testing when, in fact, in many instances, such services were not rendered as billed; and

- Other misrepresentations, including but not limited to those contained in paragraphs 1 through 203 above.

433.     On information and belief, in numerous instances, the medical records, reports and bills submitted by Defendants to Plaintiffs Liberty Mutual Fire Insurance Company and LM General Insurance Company in connection with pf-NCS Testing set forth fictional findings, diagnoses and representations of the services provided. The false representations contained therein not only were intended to defraud Plaintiffs Liberty Mutual Fire Insurance Company and LM

General Insurance Company, but constitute a grave and serious danger to the Covered Persons and the consumer public, particularly if the sham and fictional diagnoses and test results were to be relied upon by any subsequent healthcare provider.

434.    The foregoing was intended to deceive and mislead Plaintiffs Liberty Mutual Fire Insurance Company and LM General Insurance Company into believing that Villano, through Spinal Pro Chiropractic was providing medically valid services when, in fact, he was not.

435.    Defendants knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiffs Liberty Mutual Fire Insurance Company and LM General Insurance Company to rely thereon.

436.    Plaintiffs Liberty Mutual Fire Insurance Company and LM General Insurance Company did in fact reasonably and justifiably rely on the foregoing material misrepresentations, which they were led to believe existed as a result of Defendants' acts of fraud and deception.

437.    Had Plaintiffs Liberty Mutual Fire Insurance Company and LM General Insurance Company known of the fraudulent content of, and misrepresentations in, the medical records, reports, treatment verifications, and bills for medical treatment, they would not have paid Spinal Pro Chiropractic's claims for No-fault insurance benefits submitted in connection therewith.

438.    Furthermore, Defendants' far reaching pattern of fraudulent conduct evinces a high degree of moral turpitude and wanton dishonesty which, as alleged above, has harmed, and will continue to harm, the public at large, thus entitling Plaintiffs Liberty Mutual Fire Insurance Company and LM General Insurance Company to recovery of exemplary and punitive damages.

439.    By reason of the foregoing, Plaintiffs Liberty Mutual Fire Insurance Company and LM General Insurance Company have sustained compensatory damages and been injured in their

business and property in an amount as yet to be determined, but believed to be in excess of $11,000, the exact amount to be determined at trial, plus interest, costs, punitive damages and other relief the Court deems just.

**TWENTY-FOURTH CLAIM FOR RELIEF**

**<u>AGAINST SPINAL PRO CHIROPRACTIC, P.C.<br>AND GUY VILLANO, D.C.</u>**

**(Unjust Enrichment)**

440.    The allegations of paragraphs 1 through 203 are hereby repeated and re-alleged as though fully set forth herein.

441.    By reason of their wrongdoing, Defendants Spinal Pro Chiropractic and Villano have been unjustly enriched, in that they have, directly and/or indirectly, received monies from Plaintiffs Liberty Mutual Fire Insurance Company and LM General Insurance Company that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

442.    Plaintiffs Liberty Mutual Fire Insurance Company and LM General Insurance Company are therefore entitled to restitution from Defendants Spinal Pro Chiropractic and Villano in the amount by which Defendants have been unjustly enriched.

443.    By reason of the foregoing, one or more Plaintiffs have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $11,000, the exact amount to be determined at trial, plus interest, costs and other relief the Court deems just.

## TWENTY-FIFTH CLAIM FOR RELIEF

## <u>AGAINST ALL DEFENDANTS</u>

### (Declaratory Judgment)

444.    The allegations of paragraphs 1 through 203 are hereby repeated and re-alleged as though fully set forth herein.

445.    At all relevant times mentioned herein, the pf-NCS Testing for which Defendants sought reimbursement from Plaintiffs was provided pursuant to a predetermined course of treatment irrespective of medical necessity, and was never reimbursable under the No-fault Law pursuant to CPT Codes 95904 or 95999.

446.    Defendants have sought and continue to seek reimbursement for pf-NCS Testing using CPT Codes 95904 and 95999 and challenge Plaintiffs prior denials of such claims.

447.    A justiciable controversy exists between Plaintiffs and Defendants, since the Defendants challenge Plaintiff's ability to deny such claims.

448.    Plaintiffs have no adequate remedy at law.

449.     Defendants will continue to bill Plaintiffs for pf-NCS Testing using CPT Codes 95904 and 95999 absent a declaration by this Court that their activities are unlawful and that Plaintiffs have no obligation to pay the pending, previously-denied and any future No-fault claims for such services.

### <u>JURY DEMAND</u>

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE,** Liberty Mutual demand judgment as follows:

i)    Compensatory damages in an amount in excess of $266,000.00, the exact amount to be determined at trial, together with prejudgment interest;

ii)      Punitive damages in such amount as the Court deems just;

iii)     Treble damages, costs and reasonable attorneys' fees on the First, Fourth, Seventh, Tenth, Thirteenth, Sixteenth, Nineteenth and Twenty-Second Claims For Relief,, together with prejudgment interest;

iv)      Compensatory and punitive damages on the Second, Fifth, Eighth, Eleventh, Fourteenth, Seventeenth, Twentieth and Twenty-Third Claims for Relief, together with prejudgment interest;

v)       Compensatory and punitive damages on the Third, Sixth, Ninth, Twelfth, Fifteenth, Eighteenth, Twenty-First and Twenty-Fourth Claims for Relief together with prejudgment interest;

vi)      Declaratory relief on the Twenty-Fifth Claim for Relief declaring that Liberty Mutual has no obligation to pay any of Defendants' unpaid claims for pf-NCS Testing, whether pending, previously-denied and/or submitted, regardless of whether such unpaid claims were ever denied, and any future No-fault claims for pf-NCS Testing submitted by Defendants due to their fraudulent and deceptive scheme to induce payments for pf-NCS Testing, irrespective of the purported dates of service;

vii)     Costs, reasonable attorneys' fees and such other relief that the Court deems just and proper.

Dated:  New York, New York,
        July 20, 2020

                                        Morrison Mahoney, LLP


                                        By   /s/ Lee Pinzow
                                             Robert A. Stern
                                             Daniel S. Marvin
                                             Lee Pinzow
                                             Attorneys for Plaintiffs
                                             Wall Street Plaza
                                             88 Pine Street, Suite 1900
                                             New York, New York 10005
                                             (212) 825-1212